HARRY WEINER, APPELLEE, V. AETNA INSURANCE COMPANY, APPELLANT: ROME MILLER, CROSS-PETITIONER, APPELLEE.

FILED JULY 13, 1934. No. 29195.

*Crofoot, Frazer, Connolly & Stryker,* for appellant.

*Shotwell, Monsky, Grodinsky & Vance, Daniel J. Gross, Leon & White* and *Hotz & Hotz, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ., and LIVINGSTON, District Judge.

PAINE, J.

This is an appeal from an order discharging the jury at the close of the defendant's evidence, and entering a judgment for plaintiff for the full amount of two insurance policies issued upon the Millard Hotel, Omaha, which burned February 8, 1933. Attorney fees were also allowed Abel V. Shotwell, Daniel J. Gross, and Fred S.

White in the sum of $229.28, and to William J. Hotz, attorney for Rome Miller, in the sum of $14.64.

The petition alleged that the Millard Hotel was located at the northeast corner of Thirteenth and Douglas streets, Omaha, and was a five-story brick building, and had a composition roof, and was protected from fire by a complete sprinkler system, and alleged the purchase of a $2,500 policy, attached to the petition as exhibit A, which would have expired May 21, 1933, being policy No. 17296.

The petition further alleged that about 10 o'clock p. m., February 8, 1933, a fire started in said building, which totally destroyed the building, without any act, design, procurement, or fault on the part of the plaintiff, and resulted in a total loss, and that the actual value of the building at the time of the fire was $170,000, and that plaintiff carried a total amount of fire insurance on said building at said time of $142,500.

Plaintiff further alleged that, at the time of the fire, the Central Life Assurance Society, an Iowa corporation, held a mortgage on the property, on which loan Rome Miller was an indorser on the notes secured by said mortgage, and had paid one of the notes in the sum of $5,000, and was subrogated to the rights of the mortgagee thereunder, and plaintiff prayed judgment for the face of the policy, with interest at 7 per cent. from May 1, 1933.

For answer to this petition the defendant, Aetna Insurance Company, admitted the issuance of the policy and the occurrence of the fire; denies that said fire was without fault, design, or procurement on the part of the plaintiff, and alleges the fact to be that said fire was brought about by the act, design, procurement, and fault of the plaintiff, for the purpose of attempting to collect on the large sums of insurance carried by the plaintiff upon said property. It is further denied in the answer that the value of the property was $170,000, and alleged that its fair and reasonable value at the time of the fire was not more than $50,000, although plaintiff was carrying a total amount of fire insurance upon it of $142,500.

A similar suit was brought by the same plaintiff against the same defendant in the district court for Douglas county, upon exactly the same kind of a policy, being policy No. 17344, for $2,500, for a like premium of $12.58, which second policy would have expired July 20, 1933, and similar pleadings were filed by each of the parties. On December 4, 1933, the trial court entered an order that the two cases be tried at the same time, said order being in effect an order for consolidation of the cases. On December 12, 1933, the trial having been in progress since December 4, and the defendant having rested, the plaintiff moved the court to discharge the jury and enter judgment in favor of the plaintiff, reserving the right to put in rebuttal testimony if the motion was overruled; but after argument the motion was sustained. On December 14, 1933, a motion for new trial was filed by the Aetna Insurance Company, hereinafter called the defendant, setting out eight grounds of error of the trial court, one of which was in not requiring plaintiff to rebut the evidence offered by the defendant for misconduct of the plaintiff, and because the decision of the court is not sustained by sufficient evidence, and is contrary to the weight of the evidence and contrary to the law.

The evidence discloses that Harry Weiner bought the Millard Hotel in 1918, and had conducted it since that time, and had been its sole owner since 1921. He bought the property for $120,000, paying $20,000 in cash, and giving back a mortgage for $100,000, which had been reduced about a half. The gross income from the hotel for the fifteen years had averaged over $50,000 a year, but during the recent depression years had declined until the gross income for 1932 was only $26,317.97, and it was indicated that the hotel could not be operated profitably on that income.

At the time of the fire delinquent taxes upon the hotel property had been paid by the Central Life Assurance Society, assignees of the first mortgage, in the sum of $6,500.12, and the decree of foreclosure was entered 23

days before the fire, showing the total amount due of $51,918.98, and a second lien for Rome Miller for $5,149.98, and a nine months' stay had been taken by Harry Weiner.

Exhibit No. 49, giving a record of all policies of insurance upon the Millard Hotel, was received in evidence without objection, and discloses that on the date of the fire there was a total of 43 policies of insurance in force, as follows: Two policies for a total of $40,000 against windstorm; five policies on the furniture, fixtures, and equipment, of a total amount of $36,500; one policy on use and occupancy of $27,500; four policies of rent insurance, amounting to $20,000; and 31 policies of fire insurance, amounting to a total of $142,500. A careful examination of the exhibit No. 49 discloses that $15,000 of fire insurance would expire in 34 days after the fire; $10,000 would expire 16 days later; $17,000 would expire 30 days later; and $14,000, 21 days later; or that, by May 21 following the fire, some $56,000 of the fire insurance on this building would have expired, involving an expense of between $2,000 and $3,000 to secure the usual annual renewals at the rate paid on the policies in suit.

On October 19, 1931, Mr. Weiner had given a chattel mortgage on all of his hotel fixtures and household goods as additional security to the holder of the first mortgage upon the hotel property. He also owed a bill for a carload of coal, of $638, and on October 21, 1932, Armour & Company transcripted a judgment for a small bill of $46, and the judgment was still unpaid. Will H. Thompson & Sons were suing him for $50 and attorney fees. E. H. Luikart, as receiver of the State Bank of Omaha, had brought suit against the plaintiff on October 16, 1931, upon promissory notes for $26,000, and recovered a judgment for $28,836.58 and interest on May 15, 1933.

The plaintiff owned a residence property at 2109 Webster street, Omaha, which had been mortgaged to the Omaha Loan & Building Association, and the balance due was $3,400.67, and payments on the loan were in arrears

in the sum of $705, and as of July 24, 1933, the taxes were delinquent in the sum of $307.95, and the association had threatened foreclosure prior to the time of the fire.

On March 14, 1930, the plaintiff had leased the Fifth Avenue Hotel in Omaha for 20 years, at a rental of $500 a month for the first two years, and higher thereafter, and had turned said hotel over to his son to manage. Alfred C. Kennedy, receiver, testified that on March 1, 1933, there was $6,300 rent delinquent on said Fifth Avenue Hotel, and that the taxes that plaintiff agreed to pay by the terms of the lease were delinquent in an amount of approximately $6,000.

Entry No. 8 of the abstract sets out that a suit for personal injuries was filed against the plaintiff and two others on December 24, 1932, and that the same was still pending.

In regard to the value of the Millard Hotel property at the time of the trial, several well-known realtors of Omaha testified that the value of property in that neighborhood was declining.

Edward M. Slater, a realtor, who had served on appraisal committees of the real estate board, made an appraisal of the Millard Hotel building in June, 1932, by actual inspection and observation. He testified that the hotel was 50 years old, of an old type of frame and brick construction, and was worth between $50,000 and $60,000.

Thomas F. Quinlan, a realtor for 15 years, who had sold and leased down-town property, including hotels, had also made an inspection and appraisal of the Millard Hotel in June, 1932. He testified that the hotel was about 52 years old, of wood and brick construction, and that on February 8, 1933, the Millard Hotel and the ground on which it was located were worth from $50,000 to $60,000.

C. D. Glover, for 31 years a realtor, making a specialty of appraisal work in Omaha, having considerable experience in the appraisal of hotel properties, testified that he was familiar with the Millard Hotel; that it was built in 1882, of ordinary brick construction; that the fair and

reasonable value of the hotel property, for a slow sale, would have been $50,000 at the time of the fire. In his cross-examination he was asked whether he knew that from 1918 to the time of the fire, a period of 15 years, the hotel had taken in from transients, regular roomers, and rentals of stores, a total of $851,575.11. This would indicate average receipts over a 15-year period of $56,770 a year. It was indicated that the income for 1931 had been $37,020.97, and for 1932 had been $26,317.97. Glover testified as to the business storerooms on the street floor in the hotel building; that there were seven store fronts facing Douglas street, one had been divided into two parts, and the bus station and a little additional space on the Thirteenth street side. He testified that a tailor shop and the bus depot paid no rent, and that four others were vacant at the time of the fire. He testified that the value of a commercial building was largely based on its earning capacity, and that the type of tenants had gradually changed.

The fire which destroyed the Millard Hotel started at about 10 p. m. on Wednesday, February 8, 1933. A guest from an upstairs room telephoned down that the hotel was afire, and an alarm was at once sent in. Between 10:04 and 10:12 several fire companies were present and had streams of water turned on the fire.

The fire started in what was known as the rehearsal room, which was entered from a main hall through double doors on the floor above the lobby. It was a very large room, about 80 feet long east and west and about 40 feet wide north and south, and was nearly two stories in height, and at the time of the fire was used as a storage room. It was filled with trunks, scenery, billboards, extra beds, chairs, and other furniture, and in the southeast corner had about 50 mattresses in two piles on the floor about 10 or 11 feet high, which had been left over from an American Legion convention, when Omaha hotels were all filled.

The bill of exceptions is found in several volumes, and in

this opinion we will confine ourselves to reciting briefly what the evidence shows occurred around the hotel within 48 hours of the fire.

Robert Hutchins had been night engineer in the hotel since January 1 preceding. His hours were from 5 p. m. to 7 a. m. He testified that Otto Maurer was day engineer. Their duties were to keep up steam and do whatever repair work was necessary around the hotel. He testified that, besides the main stairs to the floor above the lobby, there was a back entrance leading to the rehearsal hall; that you could go through a swinging door in the lobby that led towards the toilet, and you could go through a door to the left, and then up the back stairs to the first floor; that there was a little hallway there, which made a little jog, and then you could go right back to the rehearsal room. To go up to the rehearsal room this back way, it was necessary to have a key, as the door on the first floor was generally kept locked, and the key to that door was kept behind the desk in the lobby. On the evening before the fire occurred, February 7, Hutchins first saw Weiner about 8 p. m., coming through the door of the rehearsal room. Weiner asked him what he was doing, and he told him he was up in the laundry to see that nothing would freeze. Weiner said he was doing a little looking around too. He saw Weiner again that evening an hour or two later in the rehearsal room. He testified that water was coming down in front of the boiler, and that is how he happened to go back up to the rehearsal room; that Otto Maurer, the day engineer, was with him. They went into the rehearsal room through the double door back of the elevator. It was dark in the room. They could not turn on the lights. He got out his flashlight and put it on the ceiling, and then they saw Weiner up on a ladder 18 or 20 feet long. He had it leaning up against a sprinkler pipe, and Weiner was up on that ladder and had a piece of pipe in his hand, which was disconnected, and water was dripping out of the pipe. That he asked Weiner what was going on up there, and he made no answer for quite a

little bit. Then Mr. Maurer asked him what was wrong, and then went over by the side of the door and hooked two wires together, and that made a light in the rehearsal room. That Mr. Weiner had on a unionall coverall and a cap, and had a flashlight in one hand. After the lights were lighted, Hutchins noticed a rubber hose, about the size of a garden hose. It was lying on the floor, with one end sticking out the window. That after the lights were lighted, Weiner came down off the ladder, went into a little room just off to the north of the mattresses from the rehearsal room, and changed his clothes. That he had never seen him do any manual work around the hotel before, and had never seen him dressed in coveralls before, and had never seen him working around ladders or the sprinkler system before that time. That if anything happened in the way of leaks, the witness, Hutchins, fixed them if he could during his night shift, and if he could not, that Mr. Maurer fixed them the next day. That after Weiner finished changing his clothes he went down to the lobby, and the witness went to the basement.

Gail Hood testified that he had been living at the Millard Hotel with his wife for about four years before the fire, and occupied room No. 302, which was nearly over the rehearsal room. He and his wife had been in the show business for years, in character and comedy parts, and had trunks filled with costumes, clothes, etc., all of their personal property in the hotel being set out in an exhibit, and amounting to about $1,600, which was all lost at the time of the fire. Mr. Hood worked two months as a night engineer at the hotel during October and November, 1932. Mr. Weiner let him out because he did not have a license, and the city inspector complained, but he occasionally worked around the hotel for Mr. Weiner. He owed Weiner between $300 and $400 for room rent, and a restaurant bill of $90 at the time of the fire. On February 7, the evening before the fire, he was loafing around the lobby, and went down in the basement to talk to Robert Hutchins, the night engineer. When he got to the basement, both

Otto Maurer, the day engineer, and Robert Hutchins, night engineer, were there. There was a lot of water down in the basement on the floor, which came from the sprinkler up in the rehearsal hall, and he and Maurer went up to look at the sprinkler. There was no light in the rehearsal hall that night, because there was a fire in the switch that afternoon and the switch had been disconnected, but it could be lighted by putting the two little ends of the wires together. Maurer turned his flashlight to look at the sprinkler system, and it had been taken apart. The pipe was disconnected at the ends. There was a plug in one end that led to the water, and the pipe was sagging down. The sprinkler heads were about eight feet apart across that room. There was a hose in the room, one end lying over by the window and the other end below the sprinkler. After he went to his room to go to bed, he got a telephone call, and went back downstairs and asked Maurer what he wanted, and was told to go back to the carpenter shop and help Robert Hutchins bail out water. Water was running out of the coal bin under the stoker pit, so they baled the water out for 15 or 20 minutes to keep the water from getting around the electric motor there. They then went back to the lobby and Maurer decided to get a room and stay there all night. Hood got up about 6:30 the next morning, February 8, and in going downstairs looked into the rehearsal hall. The hose was not in there, and he had never seen a hose there before. He worked all day the 8th, helping Otto Maurer tend the fires. About 2 p. m. Weiner came down to the basement and went in the tool room. He had a pair of shears and a piece of cardboard. About 5 o'clock that afternoon, before Maurer left, he showed Hood how to run the freight elevator. Hood had never run it before. Hood had some of Maurer's furniture stored in his room. It had been there all winter, to save storage on it, as Maurer and his wife got new stuff and moved it into an apartment. Hood had supper in his room, and went down to the rehearsal room a little before 7 p. m. and threw his flashlight on the

sprinkler, and it had been put back together, but part of the false ceiling in the room had been taken out in checkerboard shape. Three or four pieces about four feet square had been taken out right above the mattresses. At about 8 o'clock he and his wife went down to the lobby. Witness described how a person could leave the lobby and go up to the rehearsal room through the back entrance, and, leaving his wife, he started to go up the back steps that led to that door, and when he started to open the door Mr. Weiner turned the doorknob on the other side, and they met. This happened at about 9:40 that evening. He testifies that Weiner went back to the desk in the lobby, and Hood went upstairs to his room and started to pack. He did not stay in the room very long, and went down to the basement. While in the basement his wife came to the basement steps, holloing "Fire." The electric lights went out about the same time. He took his flashlight and went to the sprinkler valve to see if it was turned on, and the gauge indicated that it was turned on. When he got up to the lobby he looked up through the glass in the dome and saw a flame on the south side of the rehearsal hall. He testified that Weiner was back of the desk at the switchboard; that Jack Lindee and he started upstairs to see if they could salvage some of his stuff. That Lindee's mother's room was right across the hall from his room. On the way up to his room with Lindee, they opened the double doors to look into the rehearsal hall. Something seemed to be wedged against them, but they pushed and looked into the rehearsal hall and saw plenty of fire. The fire was where the mattresses were. It was awfully hot in there, and he had to put his hand to his face to keep it from burning, it was so hot. There was no water coming from the sprinkler system, so far as he could see.

Jack Lindee, 19 years old, resided with his parents in the Millard Hotel. He was in the lobby when the fire started. He went up the stairway and was between the first floor and the second floor above the lobby when the lights went out. With Gail Hood he went to the rehearsal

room and opened the double door leading from the hall into the room. He saw the whole back end of the rehearsal room burning like a wall of fire. It was only a minute or two after he had learned the hotel was on fire when he got into the rehearsal room five or six feet. The rehearsal room had some kind of a false ceiling in it; sprinkler pipes hung from the ceiling, and the flames were reaching the ceiling at the time he backed out.

Mrs. Vera Hood testified that she was seated in the lobby just before the fire, and that she was watching Weiner; that he picked up the keys after her husband left, and went right back through the swinging door and turned to the left, and did not go back to the toilet room; that they went to their room and stayed a few minutes and went back down to the lobby; that Weiner was not there, but she next saw him coming back from the same direction he had gone. He did not come out of the toilet room, but came from the left, where he went through the swinging door to the north, and went back to the desk again; that he was brushing his hands as he came through the swinging door, and just then the lights began to flicker in the lobby, and that she happened to look up at the glass dome and she could see fire where the rehearsal room is, and the colored boy came running down the steps, went to the desk, and told Mr. Weiner the second floor was on fire.

Henry Glade had been a captain of the Omaha fire department for 12 years; had served 24 years on the department. He served at Station No. 3, Nineteenth and Harney streets; received the first alarm at 10:04 p. m. from the box at the southwest corner of Thirteenth and Douglas. His men went up on the canopy on the Thirteenth street side of the Millard Hotel, and had water on the fire within six minutes after the alarm. They looked into the large rehearsal room and saw fire coming from the ceiling above. The fire was all dropping down from the ceiling. It was one of the hottest fires that he ever attended while on the fire department. The entire rehearsal room was afire. He states that water had no effect on it whatever.

He testified a stringy fire came down from the ceiling, and it looked like it was burning liquid falling from the ceiling. He directed his hose at the place where the fire was dropping, and it had no effect on it whatever.

James F. Matcha testified he had been a city fireman for 16 years. He was with Captain Glade on the canopy; had one foot on the window, but could not get into the rehearsal room because it was one mass of flames. Fire came down from the ceiling like a rolling ball. It was a roaring furnace. He saw no water coming from the sprinkler system while he was at the fire.

Harry Sydnor, a city fireman for 17 years, was a member of Company No. 5. The other members were Captain Thomas Shandy, George Brandt and John Cogan. Sydnor testified that his boot got full of water, and he went down the ladder to empty it, and while down there was a crash of the wall, and all of the other members of his company were killed. He also testified that he saw no water coming from the sprinkler system, and that he saw stringy burning stuff dropping from the ceiling.

Leo Lenz, a city fireman, testified that he had attended between 2,000 and 3,000 fires, including every kind of burning material. He got a step or two into the rehearsal room and then backed up. The fire was "falling from above in a kind of liquid mass, burning and awful hot." Quite a number of times there were explosions in the fire. He saw no water coming from any sprinklers at any time during the fire.

Earl Graham testified he had been a member of the Omaha fire department 24 years, and was captain at Station No. 12; that they went to the hotel on the second alarm, which was 4 to 6 minutes after the first alarm; that they got to the fire in about two minutes, and went up on the canopy to fight the fire. He said he could see burning stuff dropping down from the ceiling, "quite a ways back from the top," embers and stringy-looking stuff; that water had little effect on the fire.

Harold Hoden, a fireman, said it took about three

minutes to get there; that he was on the fire escape on the north side of the building. He described the fire as a roaring blast and fire; that water did not have much effect on it; "it looked like there was a liquid fire of some kind."

Chris Wahl was a carpenter, doing odd jobs at times for Weiner, and testified that the afternoon of the fire in the rehearsal room he was requested by Weiner to fix a hole in the end of a pole about 20 feet long; that he asked Weiner if he wanted a hook put in it, but Weiner stated he had ready what he wanted to use it for; that the witness last saw the pole in the rehearsal hall.

Lucius L. Dunaway, fire protection engineer for the Nebraska inspection bureau, reached the fire at 10:20 p. m., and stayed there all night. From a room in the Dodge Hotel across the alley, he had a good view into both the second and third floors of the Millard Hotel. He was familiar with the automatic sprinkler system, and in the glare of the flames watched the sprinkler lines, but no water came from any of the sprinkler heads. One of these heads was introduced in evidence. He said that these little bars, called links, melt at 160 degrees, and melted one of them with a lighted match before the jury. He explained that when the link melts it releases the cap sealing the water in, and the water rushes out, when the system is working, through a half-inch opening, at the rate of 50 gallons a minute, strikes a deflector above the opening, and sprays out in a large circle. The next day after the fire he examined many of the lines of the sprinkler system, and found many places where the fusible links had melted, but the sealing caps were still sitting loosely in place, showing no force of water in the pipes of the automatic sprinkler system to raise off the caps.

The evidence shows conclusively that the automatic sprinkler system was out of commission on the night of the fire, and no water came from any of the jets observed. The evidence shows that the plaintiff was found working with the system, and having a disconnected pipe of the system in his hand, and, as water was dripping from the

disconnected parts, that the system was not frozen. The fire insurance policies in suit carried a rider, reading: "Automatic Sprinkler Clause No. 2. This policy being written at a reduced rate, based on the protection of the premises by automatic sprinklers, it is a condition of this policy that, in so far as the sprinkler equipment and the water supplies therefor, are under the control of the insured, due diligence shall be used by the insured to maintain them in complete working order, and that no change shall be made in said water supplies without the consent of this company in writing."

At the close of the defendant's testimony, plaintiff moved the court to discharge the jury and enter a judgment for the plaintiff, reserving, however, the right to put on testimony in rebuttal should this motion be overruled. After argument the court sustained this motion, and made this statement to the jury: "Gentlemen of the jury, it seems a waste of your time to have kept you here during all this time and not have the issues between the parties determined, but the facts of the matter are, as I said to you, this is the first of a series of about thirty cases involved in this fire, and if this were the only one of the cases the court might hesitate much longer in determining this as a matter of law. It being the first of that series, and the defendant having an opportunity to appeal this and have the questions of law determined which would affect all of the other cases when they would be tried, I think it is a valuable saving of time ultimately to have the law of this case determined and have the defendant know just where it stands with respect to the law of its case." And thereupon the court discharged the jury and entered judgment for the plaintiff.

In the bill of exceptions we find a great deal of unnecessary record made of conversations between the attorneys, and some comments made to witnesses by attorneys which were entirely improper. The rulings upon evidence were as strict in a few points as if it were a state case for arson, but on another trial such errors will doubtless not occur.

. In the briefs, of over 400 pages, counsel have presented to the court every legal phase involved, but only a few of the points can be discussed in this opinion.

1, 2. A case somewhat in point is that of *Girard v. Vermont Mutual Fire Ins. Co.*, 103 Vt. 330, holding that the question of whether insured burned the building, covered by fire policy sued on, might be established by circumstantial evidence. Each act and circumstance offered to prove fraudulent burning of the insured building must contribute something to the proof of that fact. When fraud is the issue, the evidence necessarily takes a wide range.

"So here, though the fraud in its ultimate aspect was the burning of the buildings, any fact or circumstance, before or after that event, which in any way indicated a purpose to accomplish that fraudulent result was admissible. Indeed, that ultimate fact might be wholly established by circumstantial evidence. * * * And, when such evidence is resorted to, objections to testimony on the ground of irrelevancy are not favored because the force and effect of circumstantial facts depend largely upon their relation to each other; and acts and circumstances, although wholly inconclusive when separately considered, may by their number and joint operation be entirely sufficient to establish the *factum probandum*."

3. In *Bruff v. Northwestern Mutual Fire Ass'n*, 59 Wash. 125, the fireman designated it as a flash fire. No one had been in the place since the defendant left it. We think the evidence tending to show a destruction by fire of incendiary origin, and connecting the respondent therewith, should have been submitted to the jury for their consideration. It is held in many cases that, in a matter of this sort, if there is any evidence that the fire was incendiary, the matter should be submitted to the jury.

In *Lesser v. Jefferson Fire Ins. Co.*, 133 S. W. 551 (141 Ky. 667) it was said: "A fraudulent fire can rarely be proved except by circumstances, and the question is for the jury if there is any evidence at all of the fraudulent act."

It is earnestly insisted that there is no proof that he set the house on fire. Our rule is that the question is for the jury if there is any evidence, and we cannot say that there was no evidence, in view of all the circumstances.

In *Catalanotto v. Minneapolis Fire & Marine Ins. Co.,* 15 La. App. 320, it is firmly established that in cases of this kind circumstantial evidence is not only admissible, but is usually the only evidence obtainable, since it is very evident that in almost no instance can direct testimony of eyewitnesses be obtained. Persons desiring to burn their property for the purpose of collecting the insurance, or for any other illegal purpose, do not discuss their intentions with others, nor do they carry out such intentions in the light of, day. See, also, *Dunn v. Springfield Fire & Marine Ins. Co.,* 109 La. 520; 14 R. C. L. 1223, sec. 403. "Public policy will not permit a recovery by one who seeks to profit through his own crime." *Smith v. Germania Fire Ins. Co.,* 102 Or. 569, 19 A. L. R. 1444. See *Kimball Ice Co. v. Hartford Fire Ins. Co.,* 18 Fed. (2d) 563, 52 A. L. R. 799; *Bellman v. Home Ins. Co.,* 178 Wis. 349, 27 A. L. R. 945.

4. As the wilful or fraudulent burning of insured property is usually criminal, the question at once arises, if the defense to a suit on the policy is that the property was fraudulently burned, will it be necessary to prove such defense beyond a reasonable doubt, as would be required in a criminal case of arson, or should the defense be simply required to prove that fact by a preponderance of the evidence?

It appears that Illinois courts, with the exception of one case, have uniformly held that such a defense must be proved beyond a reasonable doubt, there being several citations of Illinois cases in 26 C. J. 542. We also find a very few early cases to the same effect, such as *Schultz v. Pacific Ins. Co.,* 14 Fla. 73, decided in 1872, in which action was brought to recover $6,000 insurance on freight shipped on a North German barque, "Mutter Schultz," from Pensacola to England. The defense was that the

vessel was designedly cast away or run ashore, and that the jury must be satisfied of this fraudulent purpose beyond a reasonable doubt. This decision and other early holdings followed the early English case of *Thurtell v. Beaumont,* 1 Bing. 339, 130 Eng. Reprint 136, decided in 1823. The plaintiff in the case at bar says in his brief: "Where the defendant relies upon the defense that property insured was destroyed by the wilful act of the insurer, he must specially plead and prove such defense, that is to say, the defendant has the burden of proving that the plaintiff committed arson"—citing *Herpolsheimer v. Citizens Ins. Co.,* 79 Neb. 685.

However, in 26 C. J. 542, we find citations from the federal courts, and from 20 states which have passed upon the question, declaring that such an action is but a civil case, and that the true rule is that it is not necessary to establish in a civil action the defense of incendiarism beyond a reasonable doubt. The supreme court of Alberta held that the unwisdom of the burdensome rule of evidence appears when one considers the modern extensions of the criminal law, and that many cases of fraud, and even of negligence, may now be crimes. *Laidlaw v. Hartford Fire Ins. Co.,* 29 D. L. R. 229. See *Brooks v. Liverpool & London & Globe Ins. Co.,* 144 So. (La. App.) 788.

In *Silverstone v. London Assurance Corporation,* 176 Mich. 525, the defense was the wilful burning by insured. It was held generally that the court should permit the widest latitude in cross-examination of plaintiff, and that an instruction requiring that the jury must be convinced that the "greater weight of circumstantial evidence" establish the fact of wilful burning required too high a degree of proof, it only being necessary to establish the defense by a preponderance of the evidence. In this case the evidence was to the effect that plaintiff's business was a losing one, and that he was in embarrassed financial circumstances, and in urgent need of money.

There should be no doubt on this point, and this court takes the stand, with the great majority of the courts, and

with the more recent trend of opinion, that it is only necessary to establish the defense of incendiarism by a preponderance of the evidence.

5. An appellate court, in reviewing an order discharging a jury at the close of the defendant's evidence, and entering judgment for plaintiff, will consider such motion as a demurrer to the defendant's evidence, and will assume the existence of every material fact which defendant's evidence tends to establish, and give the defendant the benefit of the logical inferences therefrom, and if, from the entire evidence thus construed, different minds might reasonably draw different conclusions, it will be deemed error on the part of the trial court to have entered such judgment therein. *Kehl v. Omaha Nat. Bank,* 126 Neb. 695; *Zielinski v. Dolan, ante,* p. 153; *Bainter v. Appel,* 124 Neb. 40; *In re Estate of Hoagland,* 126 Neb. 377; *Meyer v. Omaha & C. B. Street R. Co.,* 125 Neb. 712; *La Fleur v. Poesch,* 126 Neb. 263; *Gilbert v. Bryant,* 125 Neb. 731.

It is the province of a jury, and not the court, to determine whether one witness, or one set of witnesses or another, is telling the truth.

Many other questions are discussed in the briefs, but in a new trial they may not arise.

For the reasons stated herein, we find that the trial court erred in discharging the jury and entering judgment for plaintiff.

REVERSED, AND NEW TRIAL ORDERED.