CHARLES DAVIS, APPELLEE, V. SECURITY INSURANCE COMPANY, APPELLANT: CITY NATIONAL BANK OF HASTINGS, APPELLEE.

298 N. W. 687

FILED JUNE 13, 1941. No. 31089.

*Stiner, Boslaugh & Stiner*, for appellant.

*William M. Whelan, Sr., James E. Addie* and *Roscoe S. Hewitt, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

MESSMORE, J.

This is an action to recover upon a fire insurance policy for loss occurring by fire. The policy covered the contents, consisting of fixtures, furniture and equipment, located in plaintiff's place of business in Hastings, Nebraska. The cause was submitted to a jury, resulting in a verdict in favor of the plaintiff, fixing the total amount of recovery in the sum of $3,000, and the amount of recovery on the policy sued on in the amount of $600. The total amount of fire insurance carried by the plaintiff on fixtures, furniture and equipment was $7,500. The policy in suit was for $1,500. The other policies are set forth in the pleadings, but do not constitute the basis of this action. Motion for a new trial was overruled. Defendant Security Insurance Company (hereinafter referred to as the defendant) appeals.

The pleadings, so far as necessary to a decision in this case, may be briefly summarized as follows: The petition states a proper cause of action. The principal defense is: The fire was caused by the wilful and intentional act of the plaintiff for the purpose of burning and destroying the personal property described in and covered by the policy of insurance, and for the purpose of defrauding this defendant and other insurance companies which had policies in force, covering the property, at the time of the fire. The

reply was a specific denial that the plaintiff, directly or indirectly, had anything to do with the fire which destroyed his property, or had any knowledge as to how the fire originated.

Defendant predicates error in that verdict and judgment are contrary to and not sustained by the evidence. This assignment of error calls for a resumé of the pertinent facts contained in the record, briefly stated as follows:

The plaintiff was engaged in operating a bakery, confectionery and restaurant business, known as the Davis Bakery, or DeLux Grill. The business had full restaurant equipment for the accommodation of 125 persons, and its usual hours of business were from 6 a. m. to 12 midnight. Plaintiff placed the value of his equipment at $14,000. Since 1928 the business was conducted on premises consisting of an ordinary brick building of two stories and a basement, plaintiff occupying the three floors. The fire occurred on the morning of July 5, 1938, between 2:30 and 3 o'clock a. m. The alarm was turned in at 2:57 a. m.

The plaintiff had been at his place of business most of the day and at least from 5 p. m. until he left at approximately 2:30 a. m., with the exception of a period of about 10 minutes, when he went to a hotel, looking for a cook, and going to a small grocery store to obtain some lettuce, about 8:30 p. m. He did not know the name of the store or who operated it, and he did not buy the lettuce. He employed several persons, and his wife assisted him in the store. One girl remained to help in the work until midnight. No other person was in or about the premises from that hour, only the plaintiff. He worked around the premises and finally, when checking the fountain, discovered some difficulty in getting carbonated water properly through the fountain. He went to the basement to check the carbonator, located in the south end of the basement below the fountain, and, after working some time with the valves, he discovered a crack in the gauge, so he gave up fixing the carbonator. He was in the basement approximately an hour and a half. He had locked the front door and left by the rear door,

slamming it behind him. It had a spring lock and, when closed, would lock. Plaintiff's automobile was parked in the alley adjacent to his place of business. He got into his car and tried to start it, but it was hard to start and he used five to ten minutes in the attempt. All of a sudden he heard something like a boom, or explosion. He then ran from his car down toward Wheeler's taxi office, some 40 feet distant, and called to Wheeler, who was outside the door, to call the fire department; that his place of business was burning. Wheeler told plaintiff to move his car so that the fire truck could come in, and plaintiff then drove his car one block west, where he parked it, returned to the store and stayed in the alley. Soon the fire truck came and he saw flames go through the building. The back part of it was dense with smoke. He requested Wheeler to get a taxi for him, and he went home, awakened his wife, and they came back to the burning building.

Exhibit 13 discloses the interior of the first floor of the building. The entrance faces south. Along the left, or west, wall are booths which extend the full length of the room. In the south, or front, part are a counter and fountain along the east wall. Directly north of the fountain are swinging doors leading into the kitchen. To the left, or west, of a partition marking the west wall of the kitchen is a phonograph, and north of the phonograph to the end of the building are booths along the partition. There is an aisle between the booths on the west and those next to the dividing partition of the kitchen. At the south, or front, part of the room is a false ceiling, made of composition board, put in during a remodeling process in 1937. This is held in place by two-by-fours running crossways of the room, from east to west, fastened to the walls on each side and dropped a distance of about three feet from the original metal ceiling. To the north and even with the entrance to the kitchen and for some distance north, the false ceiling is dropped for a distance of about five feet. The length of the ceiling north from this point is not given, but from the exhibit it appears to be about one-third the length of the room. There is a

stairway leading from the kitchen down to the basement, 25 feet south of the door leading to the alley, and another stairway from the kitchen to the second floor along the west wall of the kitchen to the south and to a landing. From there the stairway turns to the east and ascends to the second floor. These stairways are not visible in the exhibit mentioned. There are two doors, permitting access to the building. The front door to the south, constituting the main entrance, is equipped with a lock and key and locks from the inside, and the single door at the rear, or north, leads into the space just south of the alley. This space, between the alley and the north side of the building, is large enough to accommodate an automobile, and there the plaintiff's automobile was standing, with the front facing west, at the time he left and got into his car.

In the basement there were some Frigidaire equipment, a candy machine and utensils for manufacturing candy. On the second floor there was a variety of discarded articles stored, mostly ice cream containers of gallon size, some old clothes, a commode and a mattress. There was a small room on the second floor used for storage purposes. Near the northwest corner of the second floor a hole, 20 by 40 inches in dimension, had been cut in the floor and through the ceiling, which had been there for a considerable time, probably eight or ten years. It permitted access from the second floor through the space between the original and the false ceiling. Ordinarily, a grill, made of wood, was placed over this hole and screwed or nailed to the floor. The testimony is not clear as to whether the grill was there on the night of the fire.

When the plaintiff left his place of business, he was quite sure that a light was left burning in one of the booths as a night light, which was customary. This fact is in dispute. A member of the police force, on his beat in the vicinity of the store at the time the fire broke out, heard a crash and a noise of shattered glass. He hurried to the store, looked through the front window, and saw that the place was full of smoke and that fire was dropping from the ceiling to the

floor, which appeared to be toward the back end of the dining-room, about the center of the building. The heat was so intense that it broke a window in the south end at an approximate distance of 35 to 50 feet from the fire, producing considerable smoke. A fireman who examined the premises testified the fire was a "flash fire," especially so in the neighborhood of the hole near the north end of the second floor. Immediately after the fire was extinguished and upon investigation of the premises, containers of gasoline-saturated material were found in different parts of the building, and there was evident considerable odor of gasoline. To the north of the room and to the west where the booths are located there was a strong odor of gasoline, and farther north, to the rear of the building, this odor was stronger. In the first booth from the north of the room there was a wicker basket under the seat, right-side up and containing shreds of paper, saturated with gasoline, partly burned and charred. Four or five composition ice cream containers, of gallon size, containing shredded paper and gasoline in liquid form, were located in the ceiling just above the third booth from the north end of the room, not far distant from where the wicker basket was found. Other containers were located to the east, directly over the partition running north and south in the kitchen part of the room. These containers were supported by burned boards of different widths. Some of them had fallen from a spot above the false ceiling to the floor. The liquid contents of these containers were poured into a glass jar, analyzed by an expert chemist, and found to be gasoline of the regular grade. The investigation further disclosed that the firemen had noticed drops of gasoline coming from the ceiling at the location of the containers; that there were two or more separate and distinct fires. This is shown by the testimony of the chief of the fire department, who stated: "As we got in the kitchen there was fire east of the kitchen door running through the north partition to the floor; the kitchen ceiling was on fire; the west wall of the kitchen was burned out and there was fire to the west which would be

the north end of the booths." This testimony was corroborated by the assistant chief, who testified to fire at two places; the northwest corner of the kitchen and the rear end of the booths. These locations correspond to those of the gasoline and the shredded paper.

When the plaintiff checked the cash register before closing his place of business on the night of the fire, he left $6 in change in the register. His wife was absent from the store most of the time. On two occasions she borrowed the car to go to the park, and when she returned to the store she parked it in the space in the alley, and went home. At about 4 o'clock a. m., when the fire was extinguished, plaintiff and his wife went into the building, and she took from a drawer $20 or $30, a check, a diamond ring, and a social security book. The plaintiff had not paid taxes on his personal property since 1933. The bookkeeping was done by plaintiff's wife; no complete set of books was kept, and none of them are in evidence.

The plaintiff testified that he had money in both the banks in Hastings in the name of the firm or business; that the only place he had to keep money, other than by deposit, would be in an old safe on the second floor of the premises which was not used. After laying foundation to show that plaintiff had deposits in only one bank, the defendant offered to prove the amount of deposits each month covering a period from July 19, 1937, to July 20, 1938, to show the trend of the business and its decline, as evidenced by the deposits. The record shows that the plaintiff quit the manufacture of candy about a year prior to the fire and had stored his candy and cigar cases; that he was indebted to his mother-in-law in the amount of $2,000, dated March 21, 1934, and renewed January 30, 1937, secured by a chattel mortgage on the contents of the plaintiff's place of business, released on July 15, 1939,—after the fire. There was no consideration for these advancements. Other indebtedness is disclosed by the record which need not be mentioned. The admission in evidence of the bank accounts was objected to, and the objection sustained. Even in the absence of this

evidence, which, under the circumstances, was admissible, it is obvious that the plaintiff's business was not progressing, but, rather, was declining.

The only evidence to support the plaintiff's case is his denial that he set the fire, or knew how the fire started or originated, and that the taxi driver and others had testified that immediately after the fire plaintiff did not have the odor of gasoline on his clothing or person, or appear to have handled inflammable matter; also that he bore a good reputation in the community.

The foregoing evidence is not in dispute. Suffice it to say that, under the circumstances, the plaintiff is the only one who could have set the fire. He was alone for at least two hours previous to the fire, and access to the premises could be gained only through the two doors, or through a chute into the basement which was covered by boards. Plaintiff testified that no other person was there. The containers of gasoline-saturated material were found in the part of the building where they would do the most damage, and, obviously, placed by one who was familiar with the premises and would know where to put such containers to obtain the best possible results. Prior to the remodeling, the amount of insurance, if any, carried by the plaintiff was negligible. After the remodeling, he was solicited for insurance and carried $7,500 on the fixtures and appliances of his business. The remodeling was done in July, 1937; the fire occurred July 5, 1938. Under the circumstances, the amount of insurance carried at the time of the fire is significant. The circumstances are strong and convincing, when weighed against the mere denial of the plaintiff that he did not set the fire.

In proving arson, it is rare that eyewitnesses can be produced who saw the hand which struck the match that started a fire. Consequently, cases of this nature consist almost wholly of circumstantial evidence. The evidence in this case is convincing that the defendant has proved the affirmative defense as pleaded. Literally, every fact concerning this case, except plaintiff's denial, points irresistibly to his guilt.

"When it is clear that material testimony has been disregarded by the jury, and which if considered and given due weight, would require a different verdict from that returned, a new trial will be granted." *Dunbier v. Day,* 12 Neb. 596, 12 N. W. 109; *Exchange Bank v. Gifford,* 102 Neb. 324, 167 N. W. 69.

"A verdict so clearly wrong as to induce the belief on the part of the reviewing court that it must have been found through passion, prejudice, mistake, or some means not apparent in the record, will be set aside and a new trial awarded." *Garfield v. Hodges & Baldwin,* 90 Neb. 122, 132 N. W. 923. The above cases were followed and quoted from in *Cuva v. Glens Falls Ins. Co.,* 136 Neb. 359, 285 N. W. 917.

It follows that the judgment of the district court should be and is reversed.

REVERSED.