RAPHTIS, Appellant v. ST. PAUL FIRE & MARINE INS. CO. et al., Respondents

RAPHTIS, Appellant v. MILBANK MUTUAL INS. CO. and AMERICAN NAT'L FIRE INS. CO., et al., Respondents

(198 N.W.2d 505)

(Files Nos. 10997-10998 and 10999. Opinion filed June 13, 1972)

**Martin Weeks, Jr.,** of **Bogue & Weeks,** Vermillion, for plaintiffs and appellants.

**Carleton R. Hoy,** of **Davenport, Evans, Hurwitz & Smith,** Sioux Falls, for defendants and respondents.

BIEGELMEIER, Judge.

Plaintiffs commenced three separate actions on policies of insurance issued by defendants for losses sustained as a result of fires.

Plaintiffs, Sam Raphtis and John Raphtis, are brothers; they will be referred to as Sam and John. Sam's action against two companies is for losses from two fires about a month apart in a building he owned in Vermillion, South Dakota. One of John's actions is against two companies for losses from the first fire to restaurant equipment, and the other is for business interruption. The actions are consolidated for trial to the court and on appeal. In each case the defense was that the fires were of incendiary origin, that plaintiffs increased the risk or hazard by setting the fires or causing them to be set in violation of the terms of the policies, and that the companies were, therefore, not liable. Findings, conclusions and a judgment favorable to defendants were entered from which this appeal followed.

It is not disputed that the defendant companies issued the policies or that they were in full force on the dates of the fires, which resulted in losses to plaintiffs who gave due notice thereof to the insurance companies. The trial court's findings were that, except for their denial the fires were set by them, it was established by a preponderance of the evidence that plaintiffs did increase the hazards by means within their control or knowledge; that in effect they set the fires or caused them to be set. Plaintiffs urge the evidence is of a circumstantial nature and, while they now concede the fires were of an incendiary origin, they vigorously argue the circumstances are consistent with the theory that someone other than plaintiffs set the fires. The policies issued by defendants to plaintiffs in each case all include the following clause:

"Conditions suspending or restricting insurance. Unless otherwise provided in writing added hereto this Company

shall not be liable for loss occurring (a) while the hazard is increased by any means within the control or knowledge of the insured * * *".

■ Some basic legal principles guide our review. While there was a difference in the burden of proof in some early cases, a majority of courts, with which we align this court, holds it is only necessary in civil actions to establish the defense of incendiarism by a preponderance of the evidence. That was the conclusion reached in Weiner v. Aetna Ins. Co., 127 Neb. 572, 256 N.W. 71, after a review of court opinions.[1]

■ The insured's wilful burning of the property is a defense to his claim of loss by fire and precludes recovery under the quoted increased hazard clause. This is so even where policies contain no express provision to that effect. It has been said it is contra bonos mores to allow a man to insure against the consequences of his own rascality or recover for a loss resulting from his own criminal conduct.[2]

■ Circumstantial evidence is admissible to establish the defense of incendiarism, or as often stated, "Proof of arson may be made by circumstantial evidence."[3] Indeed, proof of arson generally must of necessity rely substantially on such evidence. "In proving arson, it is rare that eyewitnesses can be produced who saw the hand which struck the match that started a fire. Consequently, cases of this nature consist almost wholly of circumstantial evidence."[4]

---

1. See also Agnew v. Farmers' Mutual Protective Fire Ins. Co., 95 Wis. 445, 70 N.W. 554; Zane v. Home Ins. Co., 191 Minn. 382, 254 N.W. 453; Natalini v. Northwestern Fire & Marine Ins. Co., 219 Iowa 806, 259 N.W. 577; Orient Ins. Co. v. Cox, 218 Ark. 804, 238 S.W.2d 757, 763, 26 A.L.R.2d 799; Anno. 124 A.L.R. 1380; 30 Am.Jur.2d, Evidence, § 1169; 44 Am.Jur.2d, Insurance, § 2046, states it to be the prevailing view.

2. So stated in State Securities Co. v. Federated Mut. Imp. & Hardware Ins. Co. (D.C. Neb.) 204 F.Supp. 207, where policy contained increase hazard clause as the policy at bar; Orient Ins. Co. v. Cox, supra note 1, and 44 Am.Jur.2d, Insurance, § 1365.

3. Klein v. Auto Owners Insurance Co., D.C.Minn., 39 F.R.D. 24; Weiner v. Aetna Ins. Co., 127 Neb. 572, 256 N.W. 71; Davis v. Security Ins. Co., 139 Neb. 730, 298 N.W. 687; Agnew v. Farmers' Mutual Protective Fire Ins. Co., supra note 1; Pacific Insurance Company of New York v. Frank, Okl., 452 P.2d 794.

4. Davis v. Security Ins. Co., supra note 3, and other authorities cited in prior notes.

Sam and John are brothers, both born in Greece. Sam came to the United States in 1952 and worked in his sister's cafe in Yankton until 1959 when he bought the Waffle Shop in Sioux City. He sold that cafe in 1962 and moved back to Yankton where he purchased an established cafe which he operated for about two months. He again moved to Sioux City and bought the Gridiron Club, and thereafter either owned or managed several bars or cafes. On December 13, 1968, at a time when he owned and operated a cafe in Sioux City, Sam bought a two-story building in Vermillion; on that date he mortgaged it to a bank for $14,400 payable in installments. The building was then subject to a lease to Tom Melenicos who continued to operate the Chimes Cafe, as it was known, until June 1969, when the business was sold to Sam. As before, to finance this purchase, Sam borrowed $8,500 from the bank. Appellants state that Sam purchased the business as an investment and to assist his brother John, a less affluent and relative newcomer from Greece, in starting a restaurant business. Sam immediately sold the business and leased the building to John who had arrived in the United States about three years before. The written transactions between Sam and John were a five-year lease in which John agreed to pay $260 a month rent commencing July 1, 1969, and a conditional sales contract whereby John agreed to pay $20,000 for the personal property of the cafe. This contract states $1,500 was paid down, and the balance of $18,500 was to be paid by John in monthly installments — first on Sam's $8,500 bank debt, the taxes and insurance, and the remaining $10,000 in monthly installments of $200 without interest to Sam.

The first Chimes Cafe fire occurred about 8:30 on the evening of September 26, 1969. An employee, who cleaned up at the end of the day's business, was in the cafe until near closing time, usually 7 p.m., when it can be inferred he was told he could leave and not finish cleaning up. In any event, John was the last to leave the building when he closed the place. Between thirty minutes to an hour later, fire was noticed in the cafe and was found to be centered near but below electrical conduits in the rear of the basement. It is conceded the fire was of incendiary origin, yet, because of its location and the method used, it deserves

mention. The only access to the basement was provided by a door and stairs inside the building. Pictures in evidence showed that wide-mouthed glass jars containing gasoline had been placed on the floor near old box parts and lumber. One of the jars had broken and its contents had ignited causing some of the wood to burn and char. Firemen testified that by using masks they reached the site of the fire through dense smoke, it was hot but the fire was out due to a rather unusual occurrence; the terrific heat had melted the solder around the water line, and as water sprayed out it turned to steam and the dense smoke and steam extinguished the fire.[5]

There was no evidence that plaintiffs had enemies or had received threats of any kind. When the 17-year-old helper came to work sometime after 4 p. m. he went to the basement to get some supplies from a refrigerator which was close by the location where the gasoline-filled glass bottles were later found; however, he saw nothing of them. John had locked the cafe when he left, and, while sitting in a bar a few doors away, he paid no attention to the six fire trucks with flashing lights and sirens which were arriving and parking in the street until he was told that his cafe was on fire.

John's financial picture was not bright. While he ran the cafe which had been an established business before his venture, the financial statement he introduced showed a net profit of $650 for three months. It included as an expense the rent of $260 a month, but it did not include anything on the $18,500 balance of the purchase price of the business. His agreement was to first pay the $9,500 on Sam's note to the bank in an amount not set out in his contract, but which Sam stated was $165 a month. This leaves a three-month profit of $155 without considering any amounts for depreciation on the fixtures or for living expenses. On this basis there was little hope he could remain in business. The restaurant, of necessity, was thereafter closed for business. John moved to Sioux City and Sam began some repair work on the cafe which was locked.

---

5. By a strange coincidence the Fire Chief was sitting in a parked car across the street from the cafe when the fire was noticed and reported.

On October 27th about 8:30 p. m., a month after the first fire, another fire occurred in the building. As the evidence conclusively shows, and it is conceded, this fire, too, was of incendiary origin. This time, however, it was in the attic near a trapdoor, and instead of glass jars of gasoline being used, it was started with burnable jugs of gasoline. Front and rear doors, both left unlocked, permitted access to a hall and rooms of the second story. No one lived there. Around eight o'clock that evening two strange men were seen backing a car up to the rear of the building, taking out what appeared to be plastic Clorox jugs and rags which they carried up the rear outside stairs. They remained a few minutes and drove away. Firemen extinguished the fire which involved most of the attic. Though the fire did considerable damage, it did not spread as expected by those who set it because of lack of oxygen; there was evidence that of the nine plastic jugs containing gasoline three were melted down, others were partially intact with gasoline in them and paper rolled up and stuck in the tops of the jugs as wicks. Seven unburned newspapers — Sioux City Journals and Des Moines Registers, dated from September 11th through September 27, 1969 — were found with the jugs; the latter originated from a town in northwest Iowa. There was evidence that John never inquired as to the cause of the first fire and evidence that Sam never inquired as to the cause of either fire.

The last person to leave a building before a fire creates a circumstance which courts have deemed important in arson cases. The evidence was held sufficient to present a jury question under similar facts in the following cases: People v. Lathrom, 192 Cal.App.2d 216, 13 Cal.Rptr. 325, 88 A.L.R.2d 785 (the accused was in debt and claimed he was losing money in a steak house he had owned for four months; this indicated motive); Weiner v. Aetna Ins. Co., 127 Neb. 572, 256 N.W. 71; Davis v. Security Ins. Co., 139 Neb. 730, 298 N.W. 687; Pueppka v. Iowa Mutual Insurance Co., 165 Neb. 781, 87 N.W.2d 410; Natalini v. Northwestern Fire & Marine Ins. Co., 219 Iowa 806, 259 N.W. 577; Klein v. Auto Owners Insurance Co., D.C.Minn., 1965, 39 F.R.D. 24; Orient Ins. Co. v. Cox, 218 Ark. 804, 238 S.W.2d 757; Zane v. Home Ins. Co., 191 Minn. 382, 254 N.W. 453, and Couch on Insurance, 2d Ed., § 74:665.

■ ■ The supposed better methods used in setting the second fire and knowledge of easy entry to the upstairs indicate information of the latter obtained from plaintiffs. Sam's testimony that he was not present in Vermillion until two or three hours after the fires was not conclusive on the trier of facts. In Zane v. Home Ins. Co., 191 Minn. 382, 254 N.W. 453, plaintiff was in a hospital 20 miles away when his brother set the fire. While some of the evidence there is different, much is similar, for there was more than a brother-to-brother relationship in Zane as also appears here. Sam started John in business, himself going into debt to do so; he not only helped John in this manner but he also gave him training by giving him employment, and Sam was managing John's claim for insurance recovery. All these circumstances indicate a close relationship rather than a claimed revenge motive claimed but not sustained in the Zane action. The court disposed of that claim by writing:

> "Take this picture of two brothers and their relations, and is it not convincing that * * * (plaintiff) was the one who planned the fire * * * ?"

The jugs and the newspapers used in the second fire were from nearby Iowa where Sam and John then lived. Without further extending the evidence, it cannot be said the trial court's findings of fact are clearly erroneous as is required by SDCL 15-6-52(a) and In re Estate of Hobelsberger, 85 S.D. 282, 181 N.W.2d 455. Rather the evidence amply supports them insofar as it concludes the fires either were set by plaintiffs or that plaintiffs caused them to be set.

A court must choose between the more than 16 pages of facts set out in Pueppka v. Iowa Mutual Insurance Co., 165 Neb. 781, 87 N.W.2d 410, and the brief disposition in Names v. Dwelling-House Ins. Co., 95 Iowa 642, 64 N.W. 628, where the court determined the sufficiency of the evidence of conspiracy to set fire to a building when the insured was miles away. It said: "We cannot set out the evidence or facts in detail. The evidence was sufficient to warrant the instruction (on the conspiracy)". An attempt to compress all facts and inferences to be gleaned from nearly 200 pages

of evidence plus exhibits into a shortened but complete resume is difficult, yet the current volume and length of opinions may compel only a statement of the conclusion in future opinions.

 Plaintiffs claim the court erred in admitting evidence of other fires in restaurants owned by Sam. The action was tried to the court without a jury, and, in reviewing the evidence, an appellate court disregards, as presumptively the trial court did,[6] all incompetent evidence.[7] Our conclusion has been reached without regard to the challenged evidence. Plaintiffs' brief refers to evidence of three previous fires involving Sam's cafes between 1959 and 1968. These three fires, for which Sam collected $46,000 fire insurance, included the Presto Cafe in Yankton, which he owned for two months and eleven days; it was totally destroyed by fire. Not included is another fire which destroyed the Coney Island Cafe in Yankton, owned by his sister, where he had formerly worked. Plaintiffs on redirect examination introduced some evidence in the nature of reports of fire departments.

 General rules of admissibility of other crimes are stated in 29 Am.Jur.2d, Evidence, § 298 through § 333, most of which deals with evidence in criminal actions. See also Arson and Related Offenses, 5 Am.Jur.2d § 58. Evidence is admissible if it tends to show intent, motive, scheme or plan. 29 Am.Jur.2d, Evidence, §§ 324, 325 and 326. Three fires in nine months was held admissible to show motive.[8] Generally in a fire insurance case, where circumstantial evidence is resorted to, the objections to testimony as irrelevant are not favored, and the evidence must necessarily take a broad range.[9] Such evidence is to be received with caution, yet in this civil action we conclude no error occurred under this record.[10]

6. Murdo Ind. Sch. Dist. v. Litzenberg, 58 S.D. 162, 235 N.W. 606.

7. Rogers v. Standard Life Ins. Co., 54 S.D. 107, 222 N.W. 667.

8. Terpstra v. Niagara Fire Insurance Company, 26 N.Y.2d 70, 308 N.Y.S.2d 378, 256 N.E.2d 536.

9. Lesser v. Jefferson Fire Ins. Co., 141 Ky. 667, 133 S.W. 551; Agnew v. Farmers' Mutual Protective Fire Ins. Co., supra note 1, and Weiner v. Aetna Ins. Co., 127 Neb. 572, 256 N.W. 71.

10. See 87 A.L.R.2d 891 for annotation on admissibility of evidence of other fires where references are predominantly to criminal actions.

·In view of the conclusion reached, other errors as to damages and attorneys' fees are not pertinent.

Affirmed.

HANSON, P. J., and WINANS and DOYLE, JJ., concur.

WOLLMAN, J., dissents.

WOLLMAN, Judge (dissenting).

I would reverse and remand this case for new trial for the reason that in reaching the decision that the hazards had been increased by means within the control or knowledge of plaintiffs, the trial court expressly recited in its findings that plaintiff Sam Raphtis had experienced three previous fires during his restaurant career and had collected in excess of $46,000 in insurance proceeds. The official fire reports list nonincendiary causes for the three prior fires. The fact that Sam Raphtis had experienced three prior nonincendiary fires does not seem to me to be of any probative value in reaching the conclusion that he and John either set or helped to set the fires in Vermillion. It is undisputed that restaurants have a higher risk of fire than do other businesses. The property was not overinsured. There was evidence of an earlier unexplained incendiary fire in another area of Vermillion. The trial court made no finding as to John's financial status. Since we do not know whether John was living in baronial splendor or with Spartan simplicity, I am not prepared to say that there was little hope that he could stay in business, especially in light of the fact that much of his direct financial obligation was to his brother Sam, who apparently was interested in seeing John succeed in the restaurant business.

Perhaps the trial court would have reached the same result had it not considered the evidence of the three prior fires. Because the trial court did consider this evidence, however, how can we say that the result reached was correct unless we in effect sit as trial judges and weigh the evidence as we think the trial court would have had it not considered the evidence of the prior fires? It is one thing to say that a trial court's findings are not clearly

erroneous when the evidence upon which the findings were based is probative and admissible; it is quite another thing when in the process of affirming a trial court's findings we disregard evidence specifically included in the findings and which perforce must have been of significance to the court in evaluating all of the evidence. To hold that we should not follow the latter course may be thought to be too narrow a restriction on the scope of appellate review, one that this writer has probably not himself consistently recognized, but nevertheless one that seems necessary if factual questions are to be decided exclusively in the trial courts.