[Crim. No. 7240.   Second Dist., Div. One.   May 17, 1961.]

THE PEOPLE, Respondent, v. ELMER CALLAWAY LATHROM, Appellant.

Ramsey & Emlein for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal from a judgment of conviction of arson.

In an information filed in Los Angeles County the defendant was charged with a violation of section 447a, Penal Code, in that he allegedly, on or about October 4, 1959, unlawfully and maliciously set fire to certain buildings at 4124 East Slauson Avenue in Maywood. Defendant was charged with a prior conviction of larceny of automobile (1924 in Kansas) and of receiving stolen property (1958 in California). Such latter charges were stricken by order of the court. In a jury trial the defendant was found guilty as charged. An application for probation and a motion for a new trial were denied. Defendant was sentenced to the state prison.

Defendant has appealed "from the judgment of guilty rendered and entered . . . against defendant, the sentencing of defendant, the denial of defendant's motion for a new trial and defendant's motion for an advised verdict of acquittal."

█ The sentence is nonappealable (*People* v. *Gallardo,* 41 Cal.2d 57, 60 [257 P.2d 29]), as is the order denying an advised verdict. (See Pen. Code, § 1237.)

Some of the facts of the case are as follows:

A place of business known as "Fowler's Steak House" was located on the date in question on East Slauson Avenue, Maywood, California. The appellant was tending bar at the place on the night of October 4, 1959, with Juanita Gann, a cocktail waitress, and Bruce Kissell, the chef. The wife of appellant and a Davis Gross, who was a friend of the waitress were also present. At appellant's suggestion they all planned to eat dinner at 11 p.m. at Walt's restaurant which was about a ten-minute drive from the steak house. Sometime between 10:15 and 10:30 p.m. the group started to leave the steak house for Walt's place. Appellant opened the door for their exit and remained in the doorway while Miss Gann, Gross and Kissell drove away in an automobile. Appellant and his wife owned a red station wagon which was parked in the rear. Appellant was the last person to leave the establishment. At the time he left the place of business the dumb-waiter was jammed between the first and second floors.

After Miss Gann and her party arrived at Walt's they sat down at a table and thereafter appellant and his wife arrived. Appellant remarked upon his arrival that they had made it by 11 o'clock. They all stayed at Walt's until about midnight and appellant then went to the Majestic on Pacific Boulevard in Huntington Park.

On the night of the fire (October 4, 1959), Donald R. Young was visiting with his estranged wife, Joyce, who re-

sided with her sister, Mrs. Bracken and her four children, in an apartment adjacent to the banquet rooms at the rear of the second story of the steak house building. Young left the apartment about 10:15 to get some soft drinks. As he left the apartment he saw the appellant's station wagon parked in the rear and as he came around toward the front of the establishment he saw a man wearing glasses and with a white shirt who resembled the appellant entering the steak house through the front door. When Young returned from making the purchase of the drinks the station wagon was still parked in the rear. There were no lights in the steak house during this time. At about 11:25 p.m. Young noticed a great deal of smoke coming from the ceiling. His wife called the fire department. When he and his wife left the building because of the smoke the red station wagon was gone. The firemen arrived about 11:30 p.m. and were unable to see any blaze until they ventilated the roof. Captain Rowell supervised the fire fighting. The dumb-waiter shaft ran from the first floor to the upstairs banquet room and was located in the common wall between the banquet room and the apartment on the second floor of the building.

A fireman noted that the fire was centralized in the dumb-waiter shaft. The heat was intense on the second floor but not so great on the first floor. The fire burned a hole in the roof in the area over the shaft and it was then determined that the shaft was on fire from the bottom to the top, the fire being greater at the top than at the bottom.

Water was applied directly onto and into the shaft and ultimately the fire was extinguished. Fire Chief Coon arrived about 11:39 p.m. Ralph Brown owned a liquor store next door to the steak house. About 12:10 a.m. October 5, 1959, appellant entered the liquor store and said, "Let the s.o.b. go. I get $2,000.00 a month for every month she's down." Appellant did not seem to be upset or overly concerned about the fire.

About 2:30 a.m. appellant approached the fire chief and said, "Chief, you can smooth out this fire with the insurance company for me, and if you will do this I will give you ten cases of whiskey, you name the brand and $500.00 right in your hand." The Chief replied, "Okay, Okay" and then reported the conversation to the police department.

The building was secured at 5:30 a.m. and the doors nailed shut. At 7:30 a.m. when the chief returned the doors were

still intact and there was no evidence of any entry during the interval.

Later that morning the appellant and his wife and his ex-wife, the bartender, dishwasher and another person removed foodstuffs, liquors and other items from the steak house to the appellant's home. Appellant complained that some of the liquor was missing. However, he was the only one seen taking any such items from the burned premises.

In or near the parking lot on the morning after the blaze the appellant talked with Robert Fowler, the former owner of the steak house. Appellant said, "I didn't burn the place," and further said to Fowler that he had better go along with him on the fire and that if he did not he would kill him. Appellant also stated that if Fowler brought appellant's brother, Louie, into the matter that he, the appellant, would "stamp his . . . guts out." There were other threats of violence by the appellant to Fowler.

It was the opinion of two experts, after examining the premises, that the fire had been set; that the point of origin of the fire was the dumb-waiter shaft; that the conditions indicated that a booster fuel had been used. There was an odor which smelled like paint thinner. The electrical wiring throughout the building was carefully checked and found to be in working order with no shorts and no failures which could have started the fire. In some of the debris at the bottom of the shaft a number of paper menus wadded into a lump were found and gave off a distinct odor. The menus were taken to the crime laboratory and examined. A chemist found the papers to contain hydrocarbon toluene, a highly volatile and inflammable product.

In 1958 Robert Fowler had incorporated the business of Fowler's Steak House. In June of 1959 he negotiated with the appellant for the sale of the stock of the company. The day the contract of sale of stock was executed Fowler first learned that the stock would not be in the appellant's name. On June 4th or 5th Fowler received a cashier's check from the appellant in the sum of $10,000. He received some other checks and cash in the sum of $7,000 for stock, merchandise and accounts receivable from the appellant and in addition thereto Fowler received another $6,500 cashier's check from appellant. There were some other financial transactions which are unnecessary to set forth herein.

Fowler received a note from appellant and later delivered it to Louie Lathrom and received therefor a check.

Fowler carried fire insurance on the steak house building and had a policy to insure for rental income and other insurance. Appellant got the keys to the steak house on about June 5, 1959, and shortly thereafter appellant caused the locks to be changed on the doors. Appellant gave orders to the employees of the establishment and conducted himself as the owner thereof. He signed a listing to sell the place.

Appellant advised Mrs. Bracken, the upstairs tenant of the apartment, to vacate before the weekend of the fire saying in effect that it was a bad place for children to be.

Before the fire appellant inquired of Brown, who owned the liquor store next door, if he had ample insurance and further asked a man who had some saddles on display or exhibit in the steak house if they were properly insured.

On June 17, 1959, Rose Strake and appellant filed a civil action against Fowler for rescission and damages for fraud. The complaint set forth that appellant had negotiated on his own behalf for the purchase of the steak house. Appellant and his wife, Waneta, filed a civil action against the corporation on demand notes executed by Rose Strake as president of the corporation in favor of the appellant. Default judgments were taken in each of the civil cases. It is apparent that it was contemplated that a judgment creditor would be in a better position to execute on a judgment than would a common creditor who had not reduced a claim to judgment. At the time of the fire the steak house was in debt for liquor inventory, for meat, vending machines and other items.

Kenneth Gale, the attorney for defendant in the course of the trial and attorney in this matter, was also the attorney for appellant in the civil actions mentioned.

During the trial the prosecution called as its witness Gale, the attorney for appellant, to testify as to the filing of the civil actions.

Appellant now urges that the evidence was insufficient to sustain the judgment and that appellant was deprived of the right to counsel.

We think from a reading of the entire record that there was ample evidence from which the jury could determine that the appellant was guilty of arson as charged. The burning was of an incendiary nature; the fire started in the jammed dumb-waiter shaft, the appellant had the opportunity to start the fire as he was the last person present in the steak house, his intentions were indicated by his statements before the fire with reference to certain fire insurance and other

matters; the appellant had a motive because he claimed the business was losing money and was in debt and told his business neighbor to let the place burn as he was collecting insurance; he was not upset and offered a bribe to the fire chief to make a good report of the fire and he threatened to kill Fowler if he did not go along with him in the matter. (See *People* v. *Stark,* 16 Cal.App.2d 467, 468-469 [60 P.2d 595]; *People* v. *White,* 19 Cal.App. 555, 556-557 [126 P. 505]; *People* v. *Miller,* 41 Cal.App.2d 252, 254-256 [106 P.2d 239]; *People* v. *Roganovich,* 77 Cal.App. 158, 160-161 [246 P. 132]; *People* v. *Freeman,* 135 Cal.App.2d 11, 12-15 [286 P.2d 565]; *People* v. *Arnold,* 53 Cal.App.2d 11, 12-13 [127 P.2d 285]; *People* v. *Burrows,* 119 Cal.App.2d 766, 768 [260 P.2d 137]; *People* v. *Richard,* 101 Cal.App.2d 631, 636-638 [225 P.2d 938].)

However, upon considering the appellant's second contention, we believe that it is well taken and that he is entitled to a new trial. Gale, the attorney for the defendant was called to the witness stand as the last witness for the people in their case in chief. No previous notice was given to counsel of such a contemplated move upon the part of the district attorney. When first sworn as a witness, Gale expressed surprise and was told by the court, ''Let's don't worry about the customary procedure. You are a witness now. We will see what happens.'' The witness was then asked if he was the attorney for the defendant. The answer was obviously to be answered in the affirmative, for the district attorney could not help knowing that Gale had represented the defendant at his first appearance in court on November 19, 1955, and at every appearance since that time and during each trial day from the start of the trial on February 26, 1960, to the date when he was called as a witness; namely on March 10, 1960.

The prosecutor produced two superior court files which had to do with certain civil actions in which Gale was the attorney for the defendant. Gale was asked if he was the attorney for the defendant in one of such civil actions and whether he had filed the actions for the defendant. Gale was also interrogated about what the customary practice was in the filing of civil actions and what his customary practice was. The witness then stated:

''THE WITNESS: Well, your Honor, may I say this, so as not to prejudice the defendant.

''The defendant is entitled to counsel here and there is no

previous showing that counsel for the People was going to call me, consequently before counsel for the People proceed that the defendant here would be entitled to counsel for cross examination or any objections they might wish to make.''

The court then stated:

''THE COURT: You may interpose any objection you have on the witness stand, if you think they are improper.''

The prosecutor asked substantially the same questions with reference to the second civil complaint file and inquired whether Gale was authorized to file such complaint. Gale stated in effect that the matters into which the inquiry was pointed were privileged and that the defendant was entitled to have an attorney present to claim the privilege if he so desired and stated further ''I have no way of knowing——.'' The court then interposed:

''THE COURT: Well, this is a matter of public record now, Mr. Gale. I will rule that it is beyond the scope of the at-torney-client privilege.''

The witness attempted to object to the question upon the ground that whether he had authority to bring the action was asking for a conclusion. The objection was promptly over-ruled and the witness was ordered to answer. Gale was then required to read the title of the complaint, giving the names of the parties, and a statement that the complaint was for ''rescission and damages—fraud.'' The witness was directed to read to the jury certain sections of the complaint. An attempt at an objection was made by Gale upon the ground that the matter was immaterial and incompetent to prove or disprove any issue in the case. At a conference at the bench, out of the hearing of the jury (but apparently within the presence of the jury), certain statements were made and matters disposed of. After the case was back on the record, so to speak, the witness added the objection that the matter sought to be elicited was hearsay. The judge stated:

''THE COURT: The objection that it is hearsay is overruled on the ground that it may be an admission of an agent within the course and scope of his employment.

''Is it for the purpose of showing the identity between the corporation or the intertwining interests of the defendant Lathrom here?''

The witness objected to a portion of the document's going into evidence and insisted that if any part was introduced then the whole file should be introduced. Gale was then

ordered to read a paragraph of the complaint to the jury. Questions were put as to whether a default was ever taken against one of the defendants who was represented by another attorney, whether there had been any talk with any other attorney about a default's being entered, also as to who had been served with process and when such process service took place. The witness was only able to refer to the certificates of service in the file. The judge then asked:

"THE COURT: Before you leave that one, what was the date that the Complaint was filed?" The date was approximately two and one-half months prior to the fire.

The prosecutor referred at length to the second civil complaint file which had to do with promissory notes. The witness was directed to read certain paragraphs of the complaint to the jury. An objection was attempted and the prosecutor announced:

"MR. MILLARD: It is offered as evidence for the reason stated a moment ago, at the time we approached the bench." Further proceedings were then conducted out of the hearing (but within the presence) of the jury at the bench. The judge announced that he thought the matter in the civil file was material. There followed a discussion in which it is obvious that there was an attempt to confuse the witness. The court stated to the prosecutor:

"THE COURT: Very well. Well, then, this is offered for what purpose, Mr. Millard?" The prosecutor answered:

"MR. MILLARD: In conjunction with the other file, the other file tends to establish that the defendant himself was an owner of the corporation and that he was doing business under the corporate name and this tends to prove that the defendant obtained a judgment against his own corporation, and thus became a preferred creditor and would be entitled to the first proceeds of any assets of the corporation.

"THE COURT: It is also on the basis of motive?

"MR. MILLARD: Yes.

"THE COURT: The objection is overruled."

The proceedings thereafter went back onto the record before the jury and the witness was ordered to read certain other parts of the complaint to the jury. Gale was asked about what certain notes which were set forth as exhibits in the complaint provided on their face. He was questioned at length as to whether he had represented his client at the hearing on the matter in court, as to what the certificates of service showed and as to other matters which were obvious and ap-

parent on the face of the instruments in question. The witness also was asked whether he had represented various other persons, firms or corporations and as to who had first contacted him with reference to the matters set forth in the complaints. There also were questions with reference to whether a judgment creditor has a preference over a general creditor—the prosecuting attorney apparently attempting to make it appear that the witness had participated in a proceeding whereby the client (the defendant in this case) was to gain an advantage over the general creditors and that there was some sinister influence brought to bear by counsel for the defendant. The district attorney then announced, "Nothing further." The judge recognized a part of the difficulty into which defendant's case had drifted for he said:

"THE COURT: It would be rather difficult to cross examine yourself, Mr. Gale. If there is anything in the nature of cross examination matters you would like to bring out you are free now to do so."

The witness read the balance of the allegations of the first referred to complaint. The question then arose as to how the witness was to proceed—that is whether by way of putting questions to himself which admittedly would be clumsy, or otherwise. Gale attempted a narrative explanation of what had occurred and in doing so obviously made some statements which could have been classified as privileged. There was no objection under the circumstances. The witness also made an effort to explain why he had entered the default and the district attorney objected "It is not material to our case. We are only interested in one phase of it." The objection was sustained.

There were then efforts made by the witness to ask himself questions on cross-examination. The court asked several questions, none of which seemed to have as its purpose the producing of anything favorable to the defendant. Gale stated:

"MR. GALE: May I have a moment to think, if there is anything pertinent? . . .

". . . Your Honor, I have no notes on my previous testimony, I don't recall entirely, so at this time, may I discontinue cross examination, reserving the right for further cross examination later as People's witness, Mr. Gale?

"THE COURT: I don't understand your request.

"MR. GALE: I am at a loss, I have been asking the questions, not writing down notes, I don't recall any of the subjects he

went into, to be frank with you, and I can't cross examine any more, because I don't recall what they were. What I want to do is step down and reserve the right, before they rest, if they are putting on other witnesses, if something comes for further cross examination——

"THE COURT: All right, you may step down.

"MR. MILLARD: I have some redirect."

Before the witness could step down from the witness stand the prosecutor proceeded with his so-called "redirect."

References were made to "engineering the progress of the case" and "stalling the case" and other phrases not calculated to place Gale in any but an unfavorable light before the jury. Finally, the matter got so far astray on the so-called redirect that the judge cautioned the prosecution several times to not "get too far afield." The witness repeatedly related about matters which were privileged. After several warnings by the judge to keep within due bounds, the district attorney stated that he had nothing further. Summarily the court asked, "Can you think of anything else, Mr. Gale?" and he answered in the negative and the prosecution immediately rested its case.

The résumé just related covered more than 50 pages of transcript and patently covered a very considerable period of time.

The attorney general now urges that the district attorney put Gale on the witness stand to establish motive of the defendant to commit the crime. As heretofore set forth in the transcript, the district attorney when questioned in the first instance did not state that motive was the reason for the calling of Gale; rather he stated that it was for the purpose of "showing the defendant's interest in it." The court overruled the defendant's objection upon that basis. Later, when the prosecution attempted to introduce other parts of the civil files over objection the court asked the district attorney for what purpose the matter was being offered and he answered that such evidence tended to prove that the defendant obtained a judgment against his own corporation and thus became a preferred creditor. The court then said, "It is also on the basis of motive?" and the prosecutor answered, "Yes." All of this was in the presence of the jury.

[■ The general statement can be made that a defendant in a criminal trial is entitled to consult with his counsel at any time, either before or during the progress of the trial.

■ From the bare written record before us it is im-

possible to tell the degree of prejudice which defendant suffered by reason of the prosecution's calling Gale and in effect compelling him to embarrass himself and his client before the jury. Suffice it to say that the defendant did suffer considerable prejudice.

The attorney general states that the witness could have gotten up and down from the witness stand and gone back and forth to his client had he been so minded. It is difficult to see just how counsel, as a witness, could successfully have left the witness chair, gone down to wherever the defendant was seated and conferred with him, and then gone back to the witness stand to answer a question or to put a question to himself. Realistically, anyone who ever has conducted a serious criminal trial knows that such a course before a jury might well be extremely damaging to the defendant. The attorney general has suggested too that it would have been appropriate for the defendant to have gone to the witness chair and there consulted with the witness as his counsel. It takes little imagination to guess what would have taken place had the defendant in a felony criminal trial urged his right to occupy a dual role with a witness in a case and made repeated trips to the witness stand to talk over with the witness what the answer to any particular question should be. Imagine the impression that would have been made upon the jury if the defendant had walked to the witness stand and the witness had placed his hand over the microphone to the end that no one could hear what was being said to him and then the attorney-witness listened to whisperings into his ear by his client and then proceeded with an answer to a question put by a judge.

The impossibility of defendant's being able to consult with his attorney, to talk with him during the presentation of the evidence in question as contemplated in our system of administering justice is apparent. Furthermore, the impossibility of one person's being able at one time to protect the record of the defendant (i.e. figure out what objections, if any, should be made; answer the questions of the district attorney and the court in a fashion so as not to antagonize the jury or the judge and maintain a favorable impression for the defendant), and at the same time to keep in mind what questions should ultimately be asked of himself on cross-examination, and finally during all of the time to conduct himself before the jury as a witness for the prosecution and simultaneously as counsellor for the defendant, appears obvious. There was no opportunity for the defendant to call attention to any possible inaccuracy

in the testimony of the witness or to suggest proper questions on cross-examination. A most important and perhaps devastating impression was being made upon the jury.

Our Constitution guarantees that a defendant has the right to "appear and defend in person and with counsel." (Cal. Const., art. I, § 13.) It surely means with effective counsel and not one who by reason of the acts of the prosecution cannot possibly properly represent the defendant.

It was appropriately said in *People* v. *Zammora*, 66 Cal.App. 2d 166, 234 [152 P.2d 180], as follows:

"From the foregoing, it is obvious that, under the court's rulings, it was impossible for counsel to leave their table, consult with their clients in another part of the courtroom, and at the same time protect the record and listen to the testimony being given. Likewise, it was not possible for the defendants to call matters to the attention of their counsel while witnesses were testifying, or call attention to claimed inaccuracies in the testimony or to suggest to counsel questions for cross-examination.

"To us it seems extremely important that, during the progress of a trial, defendants shall have the opportunity of conveying information to their attorneys during the course of the examination of witnesses. The right to be represented by counsel at all stages of the proceedings, guaranteed by both the federal and state Constitutions, includes the right of conference with the attorney, and such right to confer is at no time more important than during the progress of the trial. A defendant in a criminal case is not required to leave his defense in the hands of his counsel, because the Constitution guarantees him the right 'to appear and defend in person *and* with counsel.' This quoted phrase from our state Constitution does not limit the right to defend in person '*or*' with counsel, but explicitly says '*and*' with counsel. A basic part of a defendant's right to counsel is that of consultation whenever necessary. To afford to the defendant the benefits of the foregoing clause of the Constitution, it is essential that he should be allowed to consult with his counsel not only prior to the commencement of his trial, but during the actual progress thereof. The framers of the Constitution and the People, in adopting it, deemed it essential to the protection of one whose life and liberty is involved in a prosecution for crime that he shall have the right to 'appear and defend in person *and* with counsel.' If he be deprived of his life or liberty without such right to appear and defend, such depriva-

tion would be without that due process of law required by the Constitution. The Constitution primarily guarantees a defendant the right to present his case with the aid of counsel. *That does not simply mean the right to have counsel present at the trial, but means that a defendant shall not be hindered or obstructed in having free consultation with his counsel, especially at the critical moment when his alleged guilt is being made the subject of inquiry by a jury sworn to pass thereon. At such time, in order that he may have absolute freedom to assist by suggestion and information in his own defense, the accused has the right to sit with his counsel, or at least to be so situated that he can freely and uninterruptedly communicate and consult with his attorney. . . .''* (Emphasis added on last portion.)

A basic part of the right is the ability to consult and confer whenever the defendant and the attorney deem it necessary and proper. If the lawyer cannot freely confer with his client without making such conference to appear in an extremely bad light before the jury it would seemingly be better trial tactics for the lawyer to forego any conferences with his client, and that apparently is exactly what Gale did in this particular instance.

We think the defendant was without the benefit of counsel in the fullest sense during a crucial part of the trial and through no fault of his own. The constitutional provision undoubtedly was adopted to secure to the accused person *all* of the benefits which might follow from the employment of counsel. Surely that connotes that the accused shall have the right to private consultation with the person he has employed as his attorney and not in practical aspect to consult with the witness who is then testifying in open court.

The prosecution, to prove its cause, did not have to call Gale as its witness. No unusual circumstances were involved. If the prosecution wanted the two civil files in evidence it would have been a simple matter to introduce them as public records without using Gale and thereby it could have established all that the records or files show upon their face. Gale nevertheless was called and thereby placed in the very bad and embarrassing position of having to argue the credibility and effect of his own testimony and appearance before the jury.

We are fully aware that different situations exist when an adversary's counsel is called as a witness, and when he voluntarily takes the witness stand and testifies for his client; nevertheless it appears that many of the objections which

have been raised to an attorney's testifying for his client apply in the present situation.

The prosecutor could not have called the defendant to testify but by the maneuver, he accomplished the next thing to it. It must be true that the prosecutor thought that by calling Gale he was assisting in bringing about a verdict of guilt against defendant; otherwise why did he call Gale? It would appear that in the exact ratio that the prosecution was being helped by the testimony of Gale the defendant was being injured; at the same time the defendant was compensating the lawyer to defend him.

The placing of Gale in the dual position which he was compelled to accept is subject to grave questioning. If Gale's credibility as a witness was shattered or if he made a bad impression as a witness because of the dual role he was required to play, the jury may have given weight to his argument in proportion to the impression he made as a witness.

It is desirable to keep the characters of an advocate and a witness in a trial sedulously separated. When there is no necessity for calling the defendant's attorney to the witness stand, as was done in this case, the procedure should be thoroughly discouraged.

Gale in this case was put in the dilemma of either expressing his own belief as to the facts of the case (that is as to his testimony) in violation of Canon 15, American Bar Association, Canons of Ethics, or of making no mention of his testimony and thereby taking the risk that the jury might consider that he was attempting to have the jury forget any statements that he might have made on the witness stand. Either situation might well have been prejudicial in its result on the jury.

Furthermore, such a procedure presents the strong probability that a dangerous effect upon the public mind will result with reference to the practice of the law. Apparently, Gale had done nothing wrong and yet the effort was made by innuendo and otherwise to show that as a lawyer he had participated in a matter which would show motive upon the part of the defendant to commit the crime in question. In other words, it brought the legal profession into serious reproach. It exposed Gale to suspicion and thereby damaged his client, the defendant.

The trier of fact, the jury, had to determine whether Gale was telling the truth as a witness. If the jury had any doubt with reference to that phase of the case, what would the

reaction be to his further conduct in the defense of his client? Law should be practiced in such a fashion as to avoid the bringing of distrust and suspicion upon the members of the profession.

We are not unaware of the dearth of authority pertinent in a case on the facts as herein stated; but there is no doubt that if such conduct were to stand with approval it could result in great and many mischievous consequences.

■ It was appropriately stated in *Glasser* v. *United States*, 315 U.S. 60, 75, 76 [62 S.Ct. 457, 86 L.Ed. 680] that the right to have *the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from a denial.* Here too, there was prejudice to the defendant, deliberately brought about by the prosecution without necessity in the due prosecution of the case and we think under the circumstances, it was grossly unfair to the defendant. The case should have been tried as though section 4½ of article VI of the Constitution of California never existed. It is a dangerous state of mind to proceed upon the theory that the prosecution can chip away or erode some of the defendant's fundamental constitutional rights and then attempt to have the judgment of conviction affirmed upon the basis that although the defendant's constitutional rights were deliberately violated, nevertheless he should stand convicted and go to the state prison because the violation by the prosecution was not too serious in the opinion of the prosecution. We think the rights of the defendant were prejudiced, and not just to a trivial extent.

The judgment is reversed.

Wood, P. J., and Lillie, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied July 12, 1961.