[Crim. No. 44449. Second Dist., Div. Three. June 25, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
ROCKY LEE GLOVER, Defendant and Appellant.

## Counsel

Russell Iungerich, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Carol Wendelin Pollack and Susan Lee Firerson, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

LUI, J.—

### Procedural Background

Appellant, Rocky Lee Glover, was charged by information with the murder of Michael John Mitchell in violation of Penal Code section 187.[1] It was alleged that during the commission and attempted commission of the offense, the principal was armed with firearms, to wit, a rifle and a handgun, within the meaning of section 12022, subdivision (a). It was further alleged that in the commission and attempted commission of the offense, appellant personally used a deadly and dangerous weapon, to wit, a handgun and/or a rifle, within the meaning of section 12022, subdivision (b).

Appellant was arraigned, pleaded not guilty, and denied the use and armed allegations. He was held to answer to the charges following the preliminary hearing. Appellant's motion to proceed in pro. per. and to retain associate counsel was denied without prejudice.

Appellant's pretrial motion to quash the search warrant (No. 18217),[2] issued to search appellant's cell, was granted in part as to "any writing or other thing relating to witnesses in the killing of Michael Mitchell." Appellant's motions to dismiss and to traverse the search warrant were denied. Appellant's motion pursuant to section 1538.5 was granted in part, but denied as to items seized from his cell pertaining to the 18th Street gang and the statements of Deputy Robbins and Daisy Molina of August 12 and August 13, 1981.

However, the court ordered all items found in appellant's jail cell during the search of August 11, 1981, and all evidence relating to those seizures,

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

[2] We have taken judicial notice of the records of the Municipal Court, Los Angeles Judicial District, contained in search warrant file No. 18217.

as well as the interviews of Daisy Molina and any evidence relating thereto, suppressed for any purpose whatsoever as a sanction against the People for oppressive and improper conduct.

On the People's motion, the use allegation pursuant to section 12022, subdivision (b), was stricken, and the court granted appellant's motion that the prosecution not be allowed to use appellant's prior burglary conviction to impeach him should he testify. Prior to commencing deliberations, the jury was advised that the use allegation had been dismissed.

The jury found appellant guilty of murder in the first degree, and further found the allegation that a principal in the offense was armed with firearms within the meaning of section 12022, subdivision (a), to be true.

Probation was denied. Appellant was sentenced to a state prison term of 25 years to life plus 1 year for the enhancement. The trial court recommended to the Board of Prison Terms that appellant serve the maximum period of time allowable by law and that parole not be considered until appellant has served at least 25 years in prison. Appellant was given credit for 261 days in custody. The court ordered that his sentence run consecutively with any time currently being served.

Appellant filed a timely notice of appeal from the judgment of conviction.

FACTUAL BACKGROUND

Early in the morning of September 18, 1980, Michael Mitchell and his wife, Dora, were in their second floor apartment at 2727 South Budlong. At approximately 4 a.m., the couple heard shots being fired from outside. Michael went onto the balcony, and Dora went into the bathroom to get dressed. When Dora came out, Michael had been shot and appeared to be dead. Autopsy reports revealed that he had been killed by a long distance gunshot wound to the head. Several .30 caliber and one .32 caliber bullets were found in the area of Mitchell's body, and six expended .30 caliber cartridge casings were found across the street from the apartment building.

Appellant was arrested on October 24, 1980, for the murder of Michael Mitchell. A .32 caliber revolver was found in his padlocked bedroom. Ballistics reports indicated that the .32 caliber bullet recovered from the area around Mitchell's body could have been fired from the revolver found in appellant's room.

At the preliminary hearing on December 29, 1980, the prosecution called appellant's brother, Mark Glover, to testify against appellant. Mark testified

that a few days prior to September 18, 1980, he was with appellant at their mother's house when appellant brought out an M-1 rifle loaded with .30 caliber bullets which he wrapped in a blanket and put in the back of his car. At that time appellant told Mark he intended to "get" George Salcido, the resident manager of the apartment building where Mitchell was shot. Mark further testified that appellant wanted to get Salcido because he believed he was a member of Los Harpy's westside gang and was behind a shooting that had taken place around September 6 in which Harpy's gang members had killed three 18th Street gang members.[3]

On August 6, 1981, shortly before the date set for trial, appellant's cell at the Los Angeles County Jail was searched for contraband and weapons as part of a general search for such items in all of the cells on appellant's block. Prior to that search, John Ouderkirk, the Los Angeles County Deputy District Attorney in charge of prosecuting appellant's case, had asked Deputy Sheriff Christopher Robbins, who was assigned to the county jail, to look for anything in appellant's cell which related to the 18th Street gang during the next routine search for contraband and weapons. During that search, Robbins noticed writing on the wall about Mark Glover, some drawings, and newspaper clippings bearing the handwritten notations "18th Street." After the search Robbins contacted Ouderkirk and reported his findings.

Subsequently, on August 10, 1981, a search warrant for appellant's jail cell was executed by a municipal court judge at 2:05 p.m. That warrant was served upon appellant's cell the following day by Detective Larry Bird at approximately 9:30 a.m.[4]

The search warrant was supported by the affidavit of Detective Bird, in which he stated that on October 21, 1980, he had interviewed a "confidential, reliable informant who had information on a Rocky Glover." Bird further stated that he had "direct knowledge that the aforementioned confidential, reliable informant has supplied information to Detective Derenia in the past which has resulted in the arrest and conviction of four individuals for murder. At no time has the informant supplied any information that proved to be false."

---

[3]At trial, Mark Glover recanted his testimony from the preliminary hearing and denied that any of his testimony given against appellant at the preliminary hearing had been true.

[4]Three categories of items were specified in the warrant: (1) "Documents and any other items showing membership in the 18th Street gang including, but not limited to, newspaper clippings reporting gang crime; any writing and/or drawing bearing 18th Street graffitti [sic], such as the number '18', '18th Street', XVIII, Rocky XVIII; slogans, logos, monikers or street gang names of persons belonging to or affiliated with the 18th Street gang;" (2) "any writing or other thing relating to witnesses in the killing of Michael Mitchell;" (3) "any writing relating to 'rat' or 'snitch'."

The "confidential, reliable informant" was, in fact, Mark Glover, who had testified against appellant at the preliminary hearing. Further, at the time of making the affidavit, Bird knew that Mark had lied either at the preliminary hearing or in a subsequent interview. He also did not have first hand personal knowledge of the information supplied by Mark Glover which led to four arrests and convictions for murder. Bird did not reveal these facts to the magistrate at the time he requested the search warrant.

Prior to serving the warrant, Robbins announced over the jail's intercom that appellant should prepare for an attorney visit. In response to this announcement, appellant gathered his papers relating to the preparation of his defense and placed them in a folder. Appellant was then handcuffed and led out of his cell by Robbins, who carried the folder. As appellant and Robbins were walking down the corridor toward the attorney room, they were met by several detectives, one of whom was Bird. The detectives showed appellant the search warrant and proceeded to appellant's cell. Appellant's file containing his defense notes was placed on a table in the cell. During the course of the search, the contents of the file containing appellant's notes were examined by officers conducting the search and the file was seized. The notes included the anticipated statement of Daisy Molina to the effect that at the time of the murder on September 18, 1980, she and appellant were in bed together and that Mark arrived later carrying a rifle and announced that he had just shot someone on Budlong.

Following the search, the defense documents which had been seized were turned over to Ouderkirk. Ouderkirk immediately placed the documents under seal with the court, but several days later he obtained a discovery order to recover them.

Prior to serving the search warrant, Bird obtained the visitor slips from the jail concerning people who had visited appellant. Following the search, he delivered those slips to Ouderkirk. On August 12, 1981, Morris Jones, an investigator for the District Attorney's Bureau of Investigation, was contacted by Ouderkirk and asked to interview three witnesses immediately. Ouderkirk told Jones at that time that the witnesses to be interviewed were people who had visited Rocky Glover and their names had been obtained from visitor slips collected at the jail. Among those visitors was Daisy Molina who was also mentioned in appellant's defense papers as a defense witness. Molina was interviewed on August 12 by Jones and another investigator, and again on August 13 by Jones, Bird and Ouderkirk. During those interviews, she denied being with appellant on the morning of September 18 and stated that she had only met appellant in January of 1981 through her brother. Appellant had told her to tell his lawyer that she and appellant had been in bed together at the time of the murder.

## DEFENSE

Appellant testified in his own behalf at trial. He testified that early in the morning of September 18, 1980, he was awakened by his brother Mark who wanted to borrow his hydraulic floor jack to help fix a friend's car. Fearing he would not get the jack back if he loaned it to his brother, appellant agreed to accompany his brother to the site of the disabled car. When appellant and Mark went outside, they met Freddie Hernandez, Ray, Tony, and another person. When appellant put the jack in the trunk of the car his brother was driving, he noticed a rifle in the trunk.

They drove to the site of the disabled car and after raising it off the ground, appellant and the others drove away. While driving, appellant took a few heavy drinks from a bottle passed to him by Mark. Shortly thereafter, appellant pulled the car to the side of the road as he had become too intoxicated to continue driving, and Freddie began driving. On 28th Street, near Budlong, Mark told Freddie to pull over. Outside the car, Mark handed appellant a jack and told him to smash the windows of some cars parked in front of a house. When appellant refused, Mark pointed an M-1 rifle at him and told him to do as he was told. Appellant noticed that Freddie was holding a .32 automatic revolver in his hand.

Appellant picked up the jack, threw it at the windshield of the car, and started to run. He heard two or three shots fired and saw his brother firing the rifle. Appellant then turned and saw a man coming out onto the balcony of the apartment building and yelled to him to get back. Mark continued shooting, and appellant saw the man touch his head before falling.

Appellant then ran to his mother's house where he met his brother and the others shortly thereafter. A confrontation between Mark and appellant ensued during which Mark pointed the rifle at appellant's head. Appellant's mother was awakened by the argument and went into the living room where she saw Mark threatening appellant. She told Mark and his friends to leave, and appellant asked her not to repeat anything she had seen.

After appellant was arrested, appellant did not reveal Mark's involvement in the shooting because he did not want to be the one to testify against his brother. He told the police that he had broken the car window but had not shot anyone. Appellant also testified that although he had previously been a member of the 18th Street gang, he left the gang in 1979 after he was shot and nearly lost his life.

## CONTENTIONS ON APPEAL

Appellant's primary contention on appeal is that he is entitled to a per se reversal of the judgment of conviction due to the impermissible search of

his cell to discover defense work product. Appellant further contends that in the event of a retrial, the Los Angeles County District Attorney's office should be recused.

DISCUSSION

*Appellant Is Not Entitled to a Per Se Reversal of His Conviction Because of the Search of His Jail Cell*

■ Appellant contends that the search of his cell resulted in the denial of a fair trial and the effective assistance of counsel. He argues that the violation of his due process rights and his Sixth Amendment right to confer in confidence with his attorney could not be cured by suppression of the fruits of the search. He further contends that he was prejudiced by the prosecution's access to defense material that it was not legally entitled to have. We disagree.

We first note that no evidence taken from appellant's jail cell nor any evidence derived therefrom was presented at trial or in any way before the jury. Given that the evidence seized during the search was never introduced, and thus had no direct effect on the jury's verdict, in effect, appellant is asking us to reverse his conviction as a sanction for prosecutorial misconduct, rather than to cure any actual prejudice appellant suffered at trial. We begin our analysis of appellant's contention with the Supreme Court case of *Barber* v. *Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818] and those cases which later considered its application, in which the prosecution, either through inadvertence or misconduct, obtained information relating to the defense strategy prior to trial, and the defendant sought dismissal of the charges or reversal of the conviction.

In *Barber,* undercover police officers participated in a "sit-in" at a nuclear power facility which resulted in the arrest of participants on charges of trespassing and unlawful assembly. After the arrest, the police officers continued as undercover agents, participating in defense strategy meetings with defense counsel. Prior to trial, defendants discovered that one of the codefendants was an undercover police officer, and moved to dismiss the criminal charges on the ground that the presence of the police officers at confidential attorney-client meetings deprived them of effective assistance of counsel and due process rights. The trial court denied the motion to dismiss. The defendants then sought a writ of prohibition to cease prosecution of the criminal charges in the Supreme Court. The Supreme Court ordered issuance of the writ, holding that defendants' right to communicate in confidence and privately with their attorneys under California law had been violated by the presence of a government agent at confidential attorney-

client meetings. The court further held that suppression of any evidence which the prosecution might have obtained from those meetings was inadequate to protect defendants' rights and such a remedy would not "deter the state from such unlawful intrusions in the future." (*Barber, supra,* 24 Cal.3d at p. 756.) The only adequate remedy to cure the violation was a dismissal of the underlying charges.

In *In re Johnson* (1979) 24 Cal.3d 769 [157 Cal.Rptr. 674, 598 P.2d 834], a companion case to *Barber,* the Supreme Court granted a writ of habeas corpus sought by participants in the "sit-in" who had already been convicted of trespassing and unlawful assembly when the writ was issued in *Barber.* Pursuant to *Barber,* the court set aside the convictions. The court declared: "The proper remedy for this denial of an accused's right to privacy of communication with his counsel is the dismissal of the charges." (*In re Johnson, supra,* 24 Cal.3d at p. 771; *Barber, supra,* 24 Cal.3d at pp. 756-759.)

While at first blush *Barber* and *Johnson* would appear to require a dismissal of pending charges anytime police or prosecutorial misconduct results in an invasion of the accused's right to communicate in privacy with his attorney as to matters relating to defense strategy, other cases to examine *Barber* have not gone so far. Since *Barber* and *Johnson* were decided, a number of cases have responded to appeals seeking reversal of convictions on similar grounds by carefully distinguishing *Barber* and *Johnson,* and applying a remedy short of dismissal.

In those cases which arose on appeal following a judgment of conviction, appellant's failure to show prejudice resulting from the prosecutorial misconduct or inadvertence which resulted in the discovery of defense material and strategy was fatal to appellant's contention that he was entitled to a reversal pursuant to *Barber.* In *People* v. *Towler* (1982) 31 Cal.3d 105 [181 Cal.Rptr. 391, 641 P.2d 1253], the district attorney entered the defendant's cell without a search warrant and seized a number of documents belonging to defendant relating to his case, including a "synopsis" of the defense. (*Towler, supra,* 31 Cal.3d at p. 121.) The trial court ordered that the seized documents be turned over to the clerk of the court, but did not hold the district attorney in contempt. The prosecution's motion at a later date to have the documents returned was denied and the documents were never introduced into evidence. Defense counsel never formally moved for a dismissal of the charges. (*Id.,* at p. 121.) The defendant appealed the subsequent conviction, arguing that the prosecutor's conduct mandated a dismissal of the criminal proceedings pursuant to *Barber.*

In upholding the conviction, the Supreme Court found that not only had Towler failed to seek a dismissal of the charges in the trial court as in

*Barber,* but he had also failed to seek the relief available under existing California and federal (pre-*Barber*) authorities which "held that if the prosecution had improperly obtained confidential information by intruding on the attorney-client relationship, the defendant could obtain a ruling requiring 'the People . . . [to] demonstrate to the satisfaction of the trial court, beyond a reasonable doubt [citation], that the evidence they seek to adduce derives in no way from the [intrusion].' [Citations.]" (*Id.,* at p. 122.)

While holding that the record was inadequate to determine whether or not dismissal would be an appropriate sanction, by way of dicta, the court went on to distinguish *Barber,* declaring: "On the facts of *Barber,* we concluded that an exclusionary sanction would not adequately protect the defendants' rights, in part because in order to enforce that sanction the defendants would have been forced to divulge the full contents of conversations to which the police informant, but not the prosecutor, had been privy. (24 Cal.3d at p. 758.) Here, however, defendant would not have had to provide any information that the prosecutor did not already know because the confidential information was contained in a written document that the prosecutor had seized. Moreover, unlike the situation in *Barber,* here it might have been readily apparent from an examination of the document whether or not the prosecution was actually aided by the information and whether some remedy short of dismissal would be adequate to protect defendant's rights. (Cf. *People* v. *Zamora* (1980) 28 Cal.3d 88, 99-103 . . . .)" (*Towler, supra,* 31 Cal.3d at p. 122.)

The same reasoning applies in the instant case. Here, as in *Towler,* the confidential information regarding defense strategy to which the prosecution was privy was contained in the written notes of appellant which were seized from his cell. Appellant was not required to further divulge information because all the information to which the prosecution had access was in the notes. Moreover, since appellant's actual defense was entirely different from the defense strategy depicted in the notes that were seized, it is difficult to imagine how the prosecution was aided by the information which was never introduced at trial.

Similarly, in *People* v. *Fulton* (1984) 155 Cal.App.3d 91 [201 Cal.Rptr. 879], the court found no prejudice sufficient to warrant dismissal where severely edited tape recordings and transcripts of conversations between the defendant and an informant were admitted at trial. In those conversations, the defendant had revealed certain aspects of the defense strategy, but those portions of the tapes and transcripts were censored and the jury heard none of the offending portions. After finding that the defendant's preindictment legal strategy was protected by the Sixth Amendment, the court went on to hold that despite all the potential prejudice readily visible, Fulton had failed

to demonstrate any prejudice sufficient to warrant a dismissal, and found suppression was an adequate remedy. (*People* v. *Fulton, supra,* 155 Cal.App.3d at pp. 99-100.)

While the case at bar is perhaps distinguishable from both *Towler* and *Fulton* since in both cases the defendants failed to seek dismissal of the charges upon discovery of the prosecutorial misconduct, and in this case appellant did seek dismissal, significantly, in both *Towler* and *Fulton,* the focus was on what, if any, *prejudice* resulted from the improper prosecutorial activity. In both cases, where defendant suffered no harm, he was not entitled to a reversal. In *Barber,* the prejudice suffered by defendants could not be calculated, and "[e]ven the blatant use of illegally obtained information [would] be difficult to prove." (*Barber, supra,* 24 Cal.3d at p. 757.) In a case such as this, however, where, with the benefit of hindsight, we know the evidence was not before the jury and the information obtained by the prosecution was contained within the four corners of the documents seized by the prosecution, prejudice is readily quantifiable.

In *In re Pratt* (1980) 112 Cal.App.3d 795 [170 Cal.Rptr. 80], it was discovered several years after the conviction that Federal Bureau of Investigation (FBI) agents had been present during defense strategy meetings. In denying habeas corpus relief, the court emphasized that there was "no showing whatsoever, short of sheer speculation and conjecture on the part of defense counsel, that the prosecuting attorney in the instant case either was aware of the FBI informants in defense camp OR received or *used* any of the knowledge obtained by FBI COINTELPRO informants concerning defense tactics or strategy during the preparation stage or during the trial itself in 1972." (*Id.,* at p. 857; italics added.)

The federal view is in accord with our holding. In *United States* v. *Morrison* (1981) 449 U.S. 361 [66 L.Ed.2d 564, 101 S.Ct. 665], a woman who had been indicted on federal drug charges and had retained counsel was questioned on two occasions by federal agents without her counsel in connection with a related investigation. She moved for a dismissal of the indictment on the ground that her Sixth Amendment right to counsel had been violated by the agents' conduct, which motion was denied. The United States Court of Appeals for the Third Circuit reversed, and on certiorari the United States Supreme Court reversed and remanded. The court declared: "Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests. . . . [¶] Our approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial. . . . [¶]

[A]bsent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate. [Fn. omitted.]" (*United States* v. *Morrison, supra,* 449 U.S. 361, 364-365 [66 L.Ed.2d 564, 568-569].)

■    Finally, we observe that requiring appellant to show prejudice on appeal from a criminal conviction, but not when the defendant petitions for a writ of prohibition following the denial of a motion to dismiss, is not a unique situation under California law. In an appeal from a conviction on the ground that the appellant was not afforded a speedy trial, appellant must show prejudice resulting from the denial, whereas a showing of prejudice is unnecessary on a petition for a writ of mandate. (*People* v. *Wilson* (1963) 60 Cal.2d 139, 151-152, 154 [32 Cal.Rptr. 44, 383 P.2d 452]; *People* v. *George* (1983) 144 Cal.App.3d 956, 960 [193 Cal.Rptr. 9].) Similarly, appellant must show prejudice when seeking appellate review of a conviction on the ground of an erroneous denial of a section 995 motion. (*People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519 [165 Cal.Rptr. 851, 612 P.2d 941].)

■    Since appellant has failed to demonstrate how he was prejudiced at trial where the evidence relating to defense strategy was neither introduced nor in any way before the jury, we find that he is not entitled to a per se reversal of his conviction on appeal.

■    Appellant also contends that he was "denied the freedom to discuss his case with his attorney, and to present the best possible defense, because he was unable to confidentially discuss matters with his attorney." We disagree.

Since the prosecution was precluded from presenting any of the evidence obtained as a result of the search of the cell as well as the interviews of Daisy Molina following the search, in our view, appellant was in no way prevented from putting on any defense, including the alibi defense set out in the notes seized from his cell. Had appellant taken the stand and testified that he and Molina were in bed together at the time of the shooting, however, appellant may have been faced with the prospect of impeachment on this defense in any case given the trial court's finding that the Molina interview was the product of inevitable discovery.[5] It is thus fair to conclude

---

[5]It is questionable whether the prosecution could have actually used the Daisy Molina interview to impeach appellant had he testified that he was with her on the night in question. A reasonable interpretation of the court's ruling might be that the court left open the possibility of impeachment by suppressing the evidence but specifically finding the Molina interview to be the product of inevitable discovery. An equally plausible interpretation would be that even though the Molina interview was the product of inevitable discovery, that interview and any observations relating to it were suppressed for purposes of impeachment as well as the prosecution's case-in-chief and rebuttal. If the interview was not available even for impeachment purposes, appellant could have put on his planned defense strategy virtually without fear of reprisal.

that appellant simply chose to avoid the risk of impeachment and put on an entirely different defense.

We also note that the defense appellant in fact presented conflicted with the planned defense strategy indicated by the documents seized from his cell. Both his planned defense strategy and his actual defense could not have been true, as each placed appellant in a different location at the time of the shooting. While we fully concur with the trial court that a criminal defendant is entitled to prepare any defense he chooses in complete privacy and confidentiality with his attorney, he is not entitled to a reversal either because he put on a perjured defense or was precluded from putting on a perjured defense due to the attendant risks of doing so.

Our holding in this case is in no way intended to condone the egregious conduct of certain members of the district attorney's office or the police in this case. We simply find that suppression of the evidence here was an adequate remedy short of dismissal to safeguard appellant's rights in the proceedings below. There is no doubt that appellant was faced with a hard choice, but one which he would have faced without the intrusion in any event. He could go forward with his original defense knowing he could be impeached, put on no defense, or put on a different defense. That appellant freely chose an option which did not net him success is not an appropriate ground for reversal.

██ Finally, we note that the cases upon which appellant relies in urging this court to grant a per se reversal of his conviction are somewhat analogous to, but factually distinguishable from, the case at bar. In all of them, the error had a direct impact on the trial and the defendant was directly prejudiced thereby, either because the improperly obtained evidence was used against the defendant at trial (*People* v. *Gardner* (1980) 106 Cal.App.3d 882 [165 Cal.Rptr. 415] [letter containing defendant's confession seized from cell and read to jury, conviction reversed]; *Spano* v. *New York* (1959) 360 U.S. 315 [3 L.Ed.2d 1265, 79 S.Ct. 1202]; *Massiah* v. *United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199] [improperly elicited statements from defendant admitted at trial, conviction reversed]; *People* v. *Collie* (1981) 30 Cal.3d 43 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776] [trial court's error in ordering discovery by prosecution of witness statements held harmless though discovered statements admitted at trial]), or because the defendant was denied assistance of counsel or due process (*People* v. *Lathrom* (1961) 192 Cal.App.2d 216 [13 Cal.Rptr. 325] [defendant's attorney called as a prosecution witness to testify leaving defendant unrepresented during trial]; *People* v. *Sarazzawski* (1945) 27 Cal.2d 7 [161 P.2d 934] [defense counsel's motion for new trial

improperly denied where counsel not given adequate opportunity to argue motion or adequate notice as to when motion to be argued]).

Ultimately, the question in this case is not whether the prosecution's conduct was egregious, which it was, but whether suppression of the evidence obtained as a result of the oppressive conduct was an adequate remedy. We find that under the facts of this case, where none of the evidence obtained from appellant's cell nor any evidence remotely related to items seized was admitted, appellant was not prejudiced and the prosecution obtained a conviction using evidence which in no way derived from the intrusion. (*People v. Towler, supra,* 31 Cal.3d at p. 122; *Wilson* v. *Superior Court* (1977) 70 Cal.App.3d 751, 760 [139 Cal.Rptr. 61].)

Because we affirm the conviction, we need not address appellant's second contention that in the event of a retrial, the Los Angeles County District Attorney's office should be recused from participating in the proceedings against appellant.

## DISPOSITION

The judgment of conviction is affirmed.

Klein, P. J., and Danielson, J., concurred.